Alva T. MITCHELL and Ida Belle Mitchell; and Energy Reserves Group, Inc., a corporation, et al., Appellees,

v.

AMERADA HESS CORPORATION, a corporation; Amoco Production Company, a corporation; Odessa Natural Corporation, a corporation; Pioneer Production Corporation, a corporation; Flag Redfern Oil Company, a corporation; Claremont Corporation, a corporation; Sabine Production Company, a corporation; and Sun Oil Co., (Delaware), a corporation, Appellants.

Nos. 53204 to 53216.

Supreme Court of Oklahoma.

Dec. 1, 1981.

Rehearing Denied Jan. 18, 1982.

H. B. Watson, Jr., Richard K. Books, Watson, McKenzie & Moricoli, Oklahoma City, for appellees/cross-appellants.

C. Harold Thweatt, Val R. Miller, Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City and Jerry L. Pickerill, Tulsa, for appellants, Amerada Hess Corp., Amoco Production Co.; Pioneer Production Corp., Flag Redfern Oil Co., Claremont Corp.; Sabine Production Co., and Sun Oil Co., (Del.).

James H. Lockhart, Gordon F. Brown, Brown & Lockhart, Oklahoma City, for appellant, Odessa Natural Corp.

HARGRAVE, Justice.

This appeal arises from the trial of 18 actions to cancel oil and gas leases in the District Court of Ellis County, Oklahoma, the Honorable Charles M. Wilson, presiding. This appeal refers to 13 of the 18 cases consolidated for trial to the extent that the evidence presented would apply to each separate case. The balance of five actions, being against Shell Oil Company, have not been appealed. A judgment in that company's favor was rendered because there was no dispute Shell had complied with those duties urged to inure in an oil and gas lease in this action.

These lawsuits were presaged by contacts with landowners by the corporate plaintiff, Energy Reserves, Inc. Under the contract sought by Energy from the mineral owners, the owners appointed Energy their agent for the purpose of obtaining a cancellation and release of the 23-year-old oil and gas leases held by defendants. If the efforts to free the minerals for lease were successful,

the contract obligated the landowners to lease to Energy and obligated Energy to pay a $100 to $150 per acre bonus and a ⅛ royalty.

The actions involve oil and gas cancellation suits brought in the latter part of 1977 and early 1978 and referred to leases in Township 17 North, Range 22 West, and Township 17 North, Range 23 West, in Ellis County. Individual plaintiffs were joined with Energy Reserves Group, Inc. Joined as defendants are: Amerada Hess Corporation, Amoco Production Co., Pioneer Production Corp., Flag Redfern Oil Co., Claremont Corporation, Sabine Production Company, Sun Oil Co., (Del.), and Odessa Natural Corp. These defendants will be referred to as the Amerada Hess Group.

Plaintiffs' first cause of action stated the individual plaintiffs owned the mineral interests in the subject land and the defendants were the lessees. This cause also alleged that exploration in the general area had established the presence of numerous potentially productive formations which the defendants had failed to explore and drew the conclusion that defendants were holding the leases through marginal production from the Tonkawa Formation for speculation. Plaintiffs' second cause of action alleged the oil and gas leases should have been released under the provisions of 52 O.S.Supp.1977 § 87.1(b) as to all formations other than the productive Tonkawa and prayed for that relief. These two causes of action were pled in all 13 cases.

The trial of these causes spread over a five day period and after testimony was taken, the trial court ruled that the defendants' demurrer to the second cause of action should be sustained in each cause of action. Referring to the first cause of action the trial court ruled the contract between the corporate plaintiff, Energy, and the individual mineral interest owners was not champertous and thus was no bar to the bringing of an action. Lastly, the trial court ruled there was an implied covenant applicable in these causes and the corporate defendants (except Shell Oil Co.) had failed to comply with the implied covenant to explore deeper

formations after first production. Pursuant to that finding the trial court decreed the remaining corporate defendants should suffer cancellation of their oil and gas leases unless they commenced or participated in the drilling of a well to test the Hunton on or before July 1, 1979. Upon failure to so commence a well by the last date appellants' interest would be cancelled as to all strata below the base of the Tonkawa formations. The judgment issued is currently stayed by order of this Court.

The appellants brief four propositions of error as sufficient to overturn the judgment of the lower court. The appellants contend it was error for the court to order the leases in question cancelled for breach of an implied covenant to further explore when these leases were held by paying production. Secondly, appellants contend the trial court erroneously held the plaintiffs not to be guilty of champerty under the facts of the cause. The third error asserted relates to sufficiency of a notice of a demand to comply with the implied covenant found to exist, while the fourth proposition relates to the correctness of the judgment in Cause # C77–80, *Miller, et al. v. Odessa Natural.*

Cross Appellants Energy Reserves, Inc., defend the judgment asserting the trial court correctly determined a breach of the implied covenant to further explore had occurred. However, appellees do not agree with the judgment issued by the trial court in that, after finding a breach of the covenant, the court provided a remedy for that breach in an alternative decree requiring a single test well to be drilled before a date certain in order to preserve the several leases involved in these actions across an area of two townships. Here cross appellants contend the proper remedy under the facts and the law applied to the cause is a decree of immediate cancellation of all leases. Cross appellants also contend that if an alternative decree was justified under the facts, compliance with the implied covenant would require a well to be drilled on each lease premises.

The Court's resolution of the issues presented for review by each party to this

appeal disposes of the contentions of both appellant and cross appellant in the answer to two queries. The first is a mixed question of law and fact while the second presents purely a question of law: Was the trial court correct in its determination that the contracts between Energy Reserves and individual plaintiffs did not bar plaintiffs from maintaining this action against defendants by virtue of the doctrine of champerty; secondly, is an action maintainable in this jurisdiction to cancel a lease for failure to further explore a lease premises during a period in which paying production is had from the lease premises.

The effect of the doctrine of champerty upon the maintenance of this action revolves first upon the applicability in this jurisdiction of the doctrine upon the facts at hand, and secondly, upon whether the defendants are proper parties to assert the existence of a champertous document.

The case of *Worrell v. Roxana Petroleum Corp.*, 144 Okl. 297, 291 P. 47 (1930), states at pp. 48–49:

> The gist of the offense or act of champerty and maintenance is an officious intermeddling in a suit which in no way belongs to one, by maintaining or assisting either party with money or otherwise to prosecute or defend it.

The *Worrell* opinion discusses the fact that the doctrine of champerty and maintenance was rooted in an English society quite different from cultural conditions now obtaining. The case discusses the general retreat of English and American authorities from the doctrine. This Court's strict limitation of the doctrine is evident upon a first reading of *Worrell*. The proof necessary to demonstrate the contract to lease for oil and gas was champertous must establish both officious intermeddling and lack of an interest in the action apart from the alleged champertous document. *Worrell, supra*, at p. 48, clearly limits the instances in which these two requirements may be satisfied. The opinion quotes from 11 C.J. 250:

> Where a person promoting the suit of another has any interest whatever, legal

or equitable, in the thing demanded, distinct from that which he may acquire by an agreement with the suitor, he is in effect also a suitor according to the nature and extent of his interest. It is accordingly a principle that any interest whatever in the subject matter of the suit is sufficient to exempt the party giving aid to the suitor from the charge of illegal maintenance. Whether this interest is great or small, vested or contingent, certain or uncertain, it affords a just reason to the party who has such an interest to participate in the suit of another. However, this interest must have existed or been acquired in some way other than through the contract containing the champertous agreement. It is the aiding of a litigation by a stranger having no interest, direct or remote, immediate or contingent, on an agreement with the party in interest, whereupon such stranger is to receive a part of the thing in dispute, that the law prohibits.

Further limiting the doctrine in modern application, *Worrell, supra*, quotes *Tron v. Lewis*, 31 Ind.App. 178, 66 N.E. 490, 493:

> An agreement to contribute to the expenses of litigation in which the person so agreeing is interested, or may reasonably suppose himself to be interested, by reason of having an interest in the question at issue, is not a champertous agreement or one subject to the charge of maintenance.

The trial court's refusal to allow the defendants to defeat plaintiffs' actions is supported by the record when the above precepts are considered.

There is American authority which has rejected the application of a charge of champerty and maintenance to the assignment of adjoining landowner's rights to a third party for the purpose of bringing an action as a matter of law. See *Blashfield v. Empire State Telegraph*, 18 N.Y.S. 250 (1892). In the causes before the Court, however, the record supports the trial court's determination of the inapplicability of the doctrine on the facts. As previously noted, any interest held by the "accused"

party separate from the transaction allegedly tainted, here the contract, defeats the charge of officious intermeddling in a suit which in no way belongs to the party. At p. 757 of the transcript of the trial, the Mid-Continent Division exploration manager for Energy Reserves, David Gray, testifies Energy owned "possibly 80 acres in 17–17–22 which was force-pooled by An-Son for a well to the Tonkawa formation." Township 17 Range 22 West is one of the two townships involved in this litigation. The following page of the transcript, p. 758, discloses Energy Reserves received 220 acres of ". . . deep rights" in exchange for operating that unit well. Further, at p. 797, the same witness testified that Energy Reserves owns leases on approximately 1,000 net acres in the South Peek Area, being Townships 17 of Range 22 West and Township 17 of 23 West. Possession of those leases is sufficient to satisfy the remote connection specified by *Worrell*, as it states at p. 48 *supra*:

It is accordingly a principle that any interest whatever in the subject matter of the suit is sufficient to exempt the party giving aid to the suitor from the charge of illegal maintenance. Whether this interest is great or small, vested or contingent, certain or uncertain, it affords a just reason to the party who had such an interest to participate in the suit of another.

The relationship thus demonstrated between the defendants and the corporate plaintiff describes a sufficient nexus of interest to defeat the maintenance allegation. The corporate plaintiff could have a legitimate interest in removing a recalcitrant lessee in order to acquire new drilling and spacing unit working interest owners in units in which it has leasehold interests. Admittedly the interest so circumscribed is remote but this Court does not intend to revitalize the doctrine of champerty and maintenance by limiting the clear statements relative to the issue found in *Worrell, supra.*

This Court has further restricted the applicability of champerty and maintenance in contemporary Oklahoma jurisprudence in

the case of *Aaronson v. Smiley*, 142 Okl. 29, 285 P. 59 (1929). There the first allegation of error discussed was that the action was dependent upon and grew out of the champertous, barratrous and illegal speculation in litigation. Therein examined was a contract between the plaintiff and the Tulsa taxpayers association. The trial court ruled the contract was champertous as a matter of law, and also ruled the defendant could not "avail himself thereof." This Court then noted the general rule given in *11 Corpus Juris, p. 270*, now found at *14 C.J.S. Champerty § 38 (1939)* as follows:

Although a contrary view has been taken [*Blixt v. Janowiak*, 188 N.W. 89, 177 Wis. 175] the rule is well settled that the fact that there is a champertous contract in relation to the prosecution of the suit between plaintiff and his attorney or between plaintiff and another layman, in no wise affects the obligation of defendant to plaintiff; it is the champertous contract and not the right of action itself which the contract avoids, and, therefore defendant cannot avail himself of the champertous agreement as a defense to the action. However, where a champertous assignment, purchase, or agreement is not collateral to the claim sued upon, but is the basis or foundation of plaintiff's suit, a judgment of dismissal or nonsuit should be rendered even though defendant is a stranger to the champertous contract. (Footnote omitted.)

*Aaronson, supra,* establishes Oklahoma as one of the jurisdictions applying the narrow view of the effect of a champertous agreement. While defendants in these cases might avoid these contracts if they were held champertous, the rights forming the basis of the lawsuits arise from the duties owed between individual plaintiffs, the lessors, and the defendants as lessees, arising from their lease contracts and the duties implied in such a relationship. The champertous character of the contract between the plaintiffs does not extinguish the duties owed the lessor-plaintiffs by defendants as lessees. This Court is entirely unwilling to disapprove of *Aaronson, supra,* by

extending the disability arising out of a champertous contract in light of the fact that the rationale behind such a doctrine applies so nebulously to present conditions of society. Therefore it is held that defendants may not defend an action to cancel a lease for violation of an implied covenant on the basis of a subsequent champertous agreement between the lessors and third parties. Under this view, the corporate plaintiff is nothing more than an excessive party plaintiff. This jurisdiction's predecessor has held as early as *Stiles v. City of Guthrie*, 3 Okl. 26, 41 P. 383 (1875) that misjoinder of parties is not ground for granting demurrer. Excessive, or misjoinder of, parties cannot be reached by demurrer but must be raised by a motion to strike. *Barton v. Harmon*, 203 Okl. 274, 221 P.2d 656 (1950). An examination of the record designated by the parties reflects no motion to strike included in the demurrer and multiple motions filed by the defendants. The individual plaintiffs were the proper parties to prosecute a lessor's action to cancel a lease. The existence of an excessive party plaintiff is not reversible error when that issue is not raised before the issues are joined on the merits and the real party in interest appears as a party plaintiff. *Stanley v. Sweet*, 202 Okl. 448, 214 P.2d 906 (1950). Defendants mentioned the issue of improper party plaintiff out of time by raising it in their answer. Furthermore, defendants have failed to raise that issue in the motion for new trial although that motion enumerates fourteen grounds for new trial. Title 12 O.S.1971 § 991(b) states that if a motion for new trial is filed and denied, the movant may not raise on appeal allegations of error that were available to him at the time of filing the motion but not raised therein.

■ The issues joined in this proceeding were raised by a real party in interest. The determination here made that there is no disability imposed upon the individual plaintiffs by virtue of their contract with Energy Reserves, Inc. presents for resolution the central issue in this appeal dealing with the existence of an implied covenant for further exploration in this jurisdiction. There is, however, one point raised by the defendants which merits discussion and that is the fact that an action to cancel an oil and gas lease is but an action in equity to cancel a contract. Thus the demand required prerequisite to an action to cancel must be made by the parties privy to the contract the action seeks to cancel. A demand from a stranger to the instrument is ineffective. From an early date in this jurisdiction it has been said it is a settled rule that the *lessor* must demand that an implied covenant be complied with before a court of equity will grant a forfeiture. *Hudspeth v. Schmelzer*, 182 Okl. 416, 77 P.2d 1123 (1938), at 1125. The ultimate issue resolving these appeals is the question of the existence of an implied covenant to further explore. This implied covenant was first posed as a theory with which to reconcile various oil and gas decisions under a single concept in an article entitled *The Implied Covenant of Further Exploration* by C. J. Meyers in 1956, found in 34 Tex.L.R. 553. That article contains citations to various Oklahoma authority as recognizing an implied covenant of further exploration.

The theory of the existence of an implied covenant to further explore as espoused by Professor Meyers in 34 Tex.L.R. at 562 requires two major inquiries: 1. Is there harm to the lessor, and 2. does that harm result from a violation of the prudent operator rule. Although recognizing the prudent operator standard is applicable to the proposed covenant, Meyers proposes that the profit motive is to be de-emphasized in determining whether a reasonably prudent operator would drill a well to previously unknown sources, basically for the reason that:

> To insist that the standard [of a prudent operator] means the same thing here [under covenant of further exploration] as in the other implied drilling covenants is to abandon a general standard altogether and to substitute a rigid rule that no well need ever be drilled unless that well will be profitable. This attitude defeats the lessor's claim before it is ever considered. Meyers, *supra*, at 557.

Failure to recognize the profit motive as an instrumental force in oil and gas leases on behalf of both lessee and lessor is to ignore the very essence of the contract. It is unquestionable that both the lessee and lessor intend to benefit monetarily from the produce of the land through sale of its hydrocarbons. To state otherwise is folly or worse. Meyers' formulation of the proposed implied covenant ignores the potential for profit, the *sine qua non* of the lease, and leaves presently extant avenues of redress untouched, which the article itself recognizes. Can the duties of the lessee be judged apart from the spectre of profit where the activity is judged exploration rather than development? To do so is unwise and unnecessary. The machinery to adjudicate an "exploration" controversy exists presently in the form of the covenant to diligently develop. The element of chance in achieving a profit from any given drilling project is invariably present and varies from a development situation to an exploration only in its magnitude. The probability of a productive well is a consideration presently existing in actions to further develop, and the need for a new rule to supplant further development litigation in cases where the odds of profitability are low is to apply two rules of law to the same legal issue. The issue is: would a prudent operator, having due consideration for the interest of both the lessee and lessor, considering all factors, including what is known about the market, the geology and adjoining activity, drill the proposed well. Chance is legion in the production of oil and gas. To say as Meyers does [1] that the covenant to further develop requires the operator to drill only those wells which must pay for themselves and pay a profit to boot is thus overly restrictive. It is this very restriction of the proper domain of the covenant to further develop that creates the jurisprudential need for an additional covenant; that of further exploration. It is simply not realistic to ignore profit as a consideration of the standard of a prudent operator simply because the lessor demands a wildcat

be drilled on a productive lease rather than an additional well to a productive formation.

In response to a finding made by a trial court appealed ultimately to the Texas Supreme Court, in *Clifton v. Koontz*, 160 Tex. 82, 325 S.W.2d 684 (1959), the Supreme Court disapproved of the existence in Texas of a covenant to further explore insofar as that covenant introduced duties not encompassed in the covenant to further develop. There the Court stated the trial authority had noted that it was not necessary for the lessor to prove that additional drilling would *probably* result in profit, and that under a covenant to further explore application of the prudent operator rule required drilling additional exploratory wells under the following scenario:

> . . . a showing that no well had been drilled to a deeper sand "coupled with the testimony of one witness that he would be willing to drill another well." *Clifton v. Koontz, supra*, at 696.

The Court in the same paragraph as above quoted specifically mentioned the article by Meyers, *supra*, and noted that a theory requiring the lessee to drill when a ready, willing and able operator would drill regardless of the certainty of profit "is untenable and diametrically opposed to our established prudent operator rule where expectation of profit is an essential element." *Clifton v. Koontz, supra*, at 697. As discussed, this Court is not prepared to ignore the profit incentive obviously tantamount in the minds of the lessor and lessee by recognizing the offered covenant. There remains the contention of the lessors here that this jurisdiction has committed itself to the recognition of such a covenant in our previous case law. Such a contention is supported by the interpretation of the commentator, Meyers, in his original article dealing with the covenant to further explore found at 34 Tex.L.R. 553 (1956). Therein Meyers states that *Doss Oil Royalty Co. v. Texas Co.*, 192 Okl. 359, 137 P.2d 934 (1943), *Neff v. Jones*, 288 P.2d 712 (Okl. 1959), and *Sand Springs Home v. Clemens*,

---

1. *Meyers, supra*, p. 554.

276 P.2d 262 (Okl.1954) are authority for the recognition of this covenant in this state. While these cases can be viewed as the proffered authority, we decline to state that the issue of probable profit is not a relevant consideration in an action to cancel a lease for failure to further develop thus creating an action to cancel for failure to further explore. In the context of the Meyers article, the epitome of the distinction between further exploration and further development is the necessity of proof by the lessor that an additional well will probably produce oil or gas in paying quantities in order to establish a cause of action for breach. Meyers states at *supra*, p. 558 that the leading case dealing with this point is *Sauder v. Mid-Continent Petroleum Corp.*, 292 U.S. 272, 54 S.Ct. 671, 78 L.Ed. 1255 (1934).

In the cause of *Sauder v. Mid-Continent Petroleum, supra*, the Federal Supreme Court cannot be charged with recognition of an implied covenant to further develop. The action was brought in Kansas to cancel an oil and gas lease which was producing in paying quantities. The theory asserted there appears from the face of the opinion, at p. 277. The findings of the State District Court are set out followed by the conclusions of law, including the following passage:

> . . . The conclusion was that petitioners had no adequate remedy at law, the respondent and its predecessors in title had not in good faith and with reasonable diligence explored and developed the lands as required by the *express* and implied covenants of the lease, . . .

Additionally, the following page of the official reporter records immediately after the history of the action the express question presented the Court for decision: "The question for decision is whether the respondent failed to comply with an implied covenant to develop the tract with reasonable diligence." A close observation of the factual recital discloses that there was a question of the existence of two productive formations on the leased premises, for

> In the vicinity there were two sands, the upper of which pinched out *eastward* of the demised premises, . . . and that wells on the latter (the subject lease) and those on the lands to the west and south thereof were in the lower sand, . . .

In reference to this formation the plaintiff had alleged that he was suffering drainage from adjacent tracts, and the evidence showed that the west tract had two offsetting wells. The trial court found there was a probability of drainage by wells on adjoining tracts. Tracts appearing in the plural it is apparent the District Court found drainage from both east and west of the lease premises. The Court's finding states there was a probability of such drainage and (assumedly because of the referred to pinch-out of that sand), only a positive test would disclose whether further offset would produce paying quantities.

The facts noted here point to a duty to drill offsets where drainage is indicated and only drilling would resolve the query of the existence of a location capable of producing paying quantities as an offset. The case by its express terms deals with the implied covenant to further develop and a lease with an express covenant to explore. Under such circumstances the case does not recognize an implied covenant to conduct further exploration without regard to profitability. While *Sauder, supra*, at 279, 54 S.Ct. at 673, describes the covenant under consideration as "a covenant on respondent's part to continue the work of exploration, development and production," the intent of such a statement [2] as not referring to Meyers' covenant to further explore can be demonstrated by reference to the citation of Oklahoma authority supporting that statement. It is *Indiana Oil, Gas & Development Co. v. McCrory, et al.*, 42 Okl. 136, 140 P. 610 (1914). The first Court syllabus in that action reflects a recognition of the

---

2. The broad language, covenant to explore, develop and produce, found therein may be a result of a lease containing a drill or pay clause rather than the now-current lease containing a conveyance for a short primary term and so long thereafter as oil and gas are found in paying quantities.

profit motive as a substantial consideration in determining the diligence exercised by a prudent operator. Therein it is stated that an oil and gas lease:

> ... contains a covenant by the lessee, arising by necessary implication from the nature of the lease and the other stipulations therein contained, that if during the term of the lease oil and gas, one or both, are found in paying quantities, the work of development and production shall be continued with reasonable diligence; that is, along such lines as will be reasonably calculated to make the extraction of oil and gas from the leased lands of mutual advantage and profit to the lessor and lessee.

Additionally, *Sauder, supra,* quotes extensively in the body of the opinion from *Brewster v. Lanyon Zinc Co.,* 140 F. 801 (1905). From that opinion the following passages from p. 814 here excerpted demonstrate the Court was not examining a duty to explore outside of the profit potential of the lease:

> ... The object of the operators being to obtain a benefit or profit for both lessor and lessee, it seems obvious, in the absence of some stipulation to that effect, that neither is made the arbiter of the extent to which or diligence with which the operations shall proceed, and that both are bound by the standard of what is reasonable....
>
> The large expense incident to the work of exploration and development and the fact that the lessee must bear the loss if the operations are not successful, require that he proceed with due regard to his own interests as well as those of the lessor.

*Doss Oil Royalty Co. v. Texas Co.,* 137 P.2d 934 (1943) on its face deals with extension wells to the same formation. The change in industry practices since that action is reflected by the fact that the two leases involved in that action totaled 140 acres and there existed 16 wells on the

property. The lessor there contended the lessee had failed to drill on each 2½ acre portion of the tract. The contention that a well should have been drilled on each 2½ acre area is substantiated by the notation that such was the practice at the time in the area. Such evidence bears directly upon profitability, and it cannot truly be said *Doss* stands as an exploration case or an action cancelling a lease without consideration of evidence relating to the profitability of further drilling.

The element of profitability as discussed is central to any formulation of a prudent operator standard. Texas has examined the desirability of recognizing the implied covenant to explore further after paying production is obtained and concluded: "The theory is untenable and is diametrically opposed to our established 'prudent operator' rule where expectation of profit is an essential element." *Clifton v. Koontz, supra,* at 697.

▇▇▇ We thus hold there is no implied covenant to further explore after paying production is obtained, as distinguished from the implied covenant to further develop. In addition to the speculative burden the offered covenant would place on lessees, the covenant as tendered is substantially served by the covenant for further development as it is interpreted in this jurisdiction while limiting the duty to drill additional wells to those instances where a prudent operator would expect a probability of potential profit from the well contemplated.[3] An example of the protection afforded the lessor by the covenant of development in this jurisdiction is found in *Dixson v. Anadarko Production Co.,* 505 P.2d 1394 (Okl. 1973). In that action, plaintiff gave a ten year primary term oil and gas lease from which gas production was obtained in the tenth year. After 13 years of gas production from the sole producing formation, a demand was made for further development which was not met. The lessee was draining the lessor's land from a well outside the

---

**3.** In this regard it is necessary to distinguish between probable expectations regarding this well and the statistical figures for the industry.

lease premises. The Court stated that where the lessor has established an unreasonable or unconscionable length of time in developing an oil and gas lease, the lessee shoulders the burden of proof to excuse his delay, facilitating cancellation of leases owned by dilatory or speculative lessees. Were this Court to treat plaintiffs' petition and the balance of the record on appeal as urging cancellation under the traditional covenant to further develop in order to present a cognizable legal theory here the record would remain insufficient to support a judgment of cancellation. Assuming the delay in further development demonstrated here would require the lessee to explain this prolonged delay, this record demonstrates conclusively that burden was met. This record contains evidence of the possible value of the South Peek area as a Hunton prospect but the record is singularly void of testimony that there is presently enough scientific data to justify immediate drilling. The witnesses employed by Energy Reserves, Inc., stated if this action were successful they would require further evaluation of engineering data as well as further testing before drilling. Additionally, the fact the present lessees are justified in continuing to test rather than drilling immediately under the prudent operator rule is underscored here by the fact that Energy did not commit itself to drill a well in the contract it entered into with the mineral owner plaintiffs here. We find no evidence that with current knowledge of the area (as opposed to knowledge gleaned from further testing yet to be done) a prudent operator should have drilled a Hunton test in the South Peek area. Thus, there is no evidentiary support for a determination that the lessee-defendants have breached the implied covenant to further develop.

Our present determination that the trial court erred in imposing an implied covenant of further exploration is fatal to cross appellants' contention the trial court erred in issuing a judgment cancelling those leases conditionally upon failure to drill a single Hunton test in the South Peek area rather than applying that condition individually to each lease.

The judgment of the trial court conditionally cancelling the oil and gas leases in these thirteen consolidated actions for breach of the offered implied covenant for further exploration is reversed as it rests upon a theory untenable in this jurisdiction.

REVERSED.

IRWIN, C. J., BARNES, V. C. J., and DOOLIN and OPALA, JJ., concur.

HODGES, LAVENDER and SIMMS, JJ., dissent.