**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DEL WEBB COMMUNITIES, INC.,
              *Plaintiff-Appellee,*

v.

CHARLES LESLIE PARTINGTON, DBA
M.C. Mojave Construction; John
Wilson,
          *Defendants-Appellants.*

No. 10-15975

D.C. No.
2:08-cv-00571-RCJ-
GWF

OPINION

Appeal from the United States District Court
for the District of Nevada
Robert C. Jones, District Judge, Presiding

Argued and Submitted
May 13, 2011—San Francisco, California

Filed July 20, 2011

Before: Betty B. Fletcher and Sidney R. Thomas,
Circuit Judges, and Lee H. Rosenthal, District Judge.*

Opinion by Judge Rosenthal

*The Honorable Lee H. Rosenthal, District Judge for the U.S. District Court for Southern Texas, Houston, sitting by designation.

## COUNSEL

Michael J. Nunez and Edmund G. Farrell, Murchison & Cumming, LLP, Las Vegas, Nevada, for the defendants-appellants.

David N. Frederick, Todd M. Touton, and Jennifer L. Braster, Lionel Sawyer & Collins, Las Vegas, Nevada, for the plaintiff-appellee.

## OPINION

ROSENTHAL, District Judge:

This is an appeal from an injunction against the owner and operators of a Nevada company that inspected homes for construction defects and encouraged homeowners to file claims against their builder under a Nevada statute. Del Webb Communities, Inc., the developer of a retirement community where the company inspected many homes, sued, alleging that the defendants' business practices violated federal and state law. The district court permanently enjoined the defendants from "soliciting and/or performing residential inspections and/or providing inspection reports in . . . Del Webb Nevada developments, by means of illegal, unlicensed and false practices, such as the representations, express or implied, that

they, or any of them are (1) properly licensed under Nevada law to perform structural inspections; (2) properly licensed under Nevada law . . . to perform, provide or communicate inspection reports; and/or (3) are acting as representatives or agents under the authority of Del Webb . . . ." We conclude that the general prohibition against operating "by means of illegal, unlicensed and false practices" is too vague to stand. We affirm the remaining provisions of the injunction but reject the district court's reliance on Nevada's common law of champerty to create a tort cause of action for which Del Webb could obtain relief. We therefore vacate the injunction in part and affirm in part.

## I.   Background

M.C.   Mojave Construction[1] is a sole proprietorship operated by Charles Leslie Partington. Partington had a limited Nevada B-2 contractor's license but no structural inspection license under Chapter 645D of the Nevada Revised Statutes. John Wilson operated Mojave's "Chapter 40 Claims Division" under a management and profit-sharing agreement with Partington. Wilson held neither a contractor's nor an inspector's license. The claims division's name refers to Chapter 40 of the Nevada Revised Statutes, which "governs actions involving constructional defects." *Shuette v. Beazer Homes Holdings Corp.*, 124 P.3d 530, 541 (Nev. 2005). The statute allows a homeowner who has notified his builder of "constructional defects" to sue the builder for damages if the builder does not repair the defects within a reasonable time. *See* NRS 40.647; *D.R. Horton Inc. v. District Court*, 168 P.3d 731, 737 (Nev. 2007). Damages under Chapter 40 include the cost of hiring an expert to "[a]scertain the nature and extent of the constructional defects." NRS 40.655(f). Instead of charging homeowners directly for its inspections, Mojave relied on this provision to obtain payment. Mojave's contracts required homeowners to submit invoices for the inspections to

---

[1]The appellants are collectively referred to as "Mojave."

the homebuilder and request payment and stated that Mojave would collect its inspection fee "if or when" the builder reimbursed the homeowner. The contracts assigned Mojave the "the right to recover any and all inspection fees from the builder if the builder fails to pay all the inspection fees."

Mojave inspected many homes in Sun City Anthem, a Del Webb retirement community in Henderson, Nevada.[2] Mojave distributed fliers door-to-door, posted placards, and advertised through a website. Mojave's fliers and placards included statements that the home inspections were "FREE"; referred to the inspections as "Builder inspections"; referred to the inspectors as "representatives & experts from both MC Mojave Construction & your Builder, his subcontractors and agents"; and stated that it had a "Construction-Lic." Mojave's various advertisements and solicitations also included statements that the inspections were done by both Mojave and the "Builder's inspection team" and that construction items "found to be deficient" would be repaired "at no cost to the homeowners." Mojave's advertisements and solicitations encouraged homeowners to file Chapter 40 claims seeking compensation for home repairs against Del Webb.

Mojave provided homeowners with engagement letters for several law firms to begin Chapter 40 actions based on defects listed in the inspection reports that Mojave generated. The engagement letters required the homeowners to pay all litigation costs if the homeowners terminated the attorney-client relationship but obtained home repairs. One of the law firms, Angius & Terry, paid Mojave $500 when a homeowner signed an engagement letter and $1,300 more if the Chapter 40 action succeeded. This law firm sent Del Webb letters instructing it to communicate only with the law firm, not the homeowners, about the homeowners' claimed construction

---

[2]The district court described the extent of the defendants' activities by noting their assertion that they were "owed receivables" of over $900,000 for 486 inspections performed, mostly in Del Webb properties.

defects, even though Del Webb provided ten-year warranties for its homes beginning in 2001.

Del Webb sued Partington d/b/a Mojave and Wilson in Nevada federal court, seeking damages and injunctive relief. The district court preliminarily enjoined Mojave from conducting further inspections. In ruling on summary judgment motions, the district court held that Mojave's agreements violated Nevada's common-law prohibition against champerty and maintenance, based on Mojave's use of its own funds and resources to instigate and prosecute Chapter 40 actions in which it had no interest and based on the requirement in Mojave's contracts with homeowners that they pay Mojave's fees from the amounts obtained from Del Webb. The district court also held that Mojave was required to have a Chapter 645D license to perform its inspections and that Mojave had falsely represented in its advertising and solicitations that it had such a license.

The district court issued a permanent injunction. The court's findings of fact and conclusions of law included that Mojave committed a tort by violating Nevada's common-law prohibition against champerty; violated the Nevada Deceptive Trade Practices Act by performing inspections without the license required under Chapter 645D; violated both the Nevada Deceptive Trade Practices Act and the Lanham Act by representing that the home evaluations were free and that Mojave was affiliated with Del Webb; and tortiously interfered with Del Webb's warranty contracts with homeowners by instructing Del Webb to communicate only with the lawyers filing the Chapter 40 action. The permanent injunction provided:

> IT IS HEREBY ORDERED that Mojave, Partington, Wilson, and their affiliates and others acting in concert with Defendants, are enjoined from soliciting and/or performing residential inspections and/or providing inspection reports in Sun City Anthem, or any

other Del Webb Nevada developments, by means of illegal, unlicensed and false practices, such as the representations, express or implied, that they, or any of them are (1) properly licensed under Nevada law to perform structural inspections; (2) properly licensed under Nevada law to . . . perform, provide or communicate inspection reports; and/or (3) are acting as representatives or agents under the authority of Del Webb . . . .

The parties resolved the damages claim and stipulated that the permanent injunction was the final judgment. Mojave timely appealed.

## II. Jurisdiction and Standard of Review

We have jurisdiction under 28 U.S.C. § 1292(a)(1). *Lonberg v. City of Riverside*, 571 F.3d 846, 847-48 (9th Cir. 2009). We will reverse an order of injunction only if the district court abused its discretion. *Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165, 1173 (9th Cir. 2007). We review factual findings for clear error and legal conclusions *de novo*. *Id.*

## III. Analysis

### A. The General Prohibition Against "Illegal, Unlicensed and False Practices"

[1] Rule 65(d) requires an injunction to "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained." Fed. R. Civ. P. 65(d)(1) (B)-(C). "The benchmark for clarity and fair notice is not lawyers and judges, who are schooled in the nuances of [the] law," but instead the "lay person, who is the target of the injunction." *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1134 (9th Cir. 2006); *see also Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) ("[T]he specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty

and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood.").

[2] The permanent injunction prohibits the defendants from "soliciting and/or performing residential inspections and/or providing inspection reports . . . by means of illegal, unlicensed and false practices." The order identifies three prohibited practices as examples — "such as" — of "illegal, unlicensed and false practices": (1) falsely representing that the defendants are "properly licensed under Nevada law to perform structural inspections; (2) properly licensed under Nevada law to . . . perform, provide or communicate inspection reports; and/or (3) are acting as representatives or agents or under the authority of Del Webb." Even with these examples, the general prohibition against using "illegal, unlicensed and false practices" is too vague to be enforceable. The examples of prohibited past conduct do not sufficiently define what additional future conduct will be covered.[3]

---

[3]*See Union Pac. R.R. Co. v. Mower*, 219 F.3d 1069, 1072-73, 1077 (9th Cir. 2000) (invalidating an injunction preventing the defendant "from disclosing or revealing to any person any information or communication of a confidential nature, including the information and communications described in the accompanying findings of fact and conclusions of law, that he acquired, learned, or helped to generate during his employment by . . . or while he was a consultant for plaintiff" because it did "not even come close to satisfying Rule 65's specificity requirements"); *Thomas v. Cnty. of Los Angeles*, 978 F.2d 504, 506, 509 (9th Cir. 1992) (holding that an injunction requiring the sheriff's department to "[f]ollow the Department's own stated policies and guidelines regarding the use of force and procedures for conducting searches" was too vague); *Fed. Election Comm'n v. Furgatch*, 869 F.2d 1256, 1263-64 (9th Cir. 1989) (holding that an injunction's vague prohibition could not be upheld even if construed to apply only to "similar violations" of the law, because "we would have no way of specifying which factual similarities the district court regarded as relevant"); 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2955, at 308-09 & n.25 (2d ed. 1995) (collecting cases).

The broad prohibition against "soliciting and/or performing residential inspections and/or providing inspection reports . . . by means of illegal, unlicensed and false practices" is vacated. We next consider the injunction's specific prohibitions.

## B. The Specific Prohibitions Against Misrepresentations

### 1. Misrepresenting Mojave's Affiliation With Del Webb

During argument, Mojave clarified that it does not challenge the injunction's prohibition on representing that it is affiliated with Del Webb or its parent, Pulte. That portion of the injunction is affirmed.

### 2. Misrepresenting Mojave's License

[3] Mojave does challenge the injunction against representing that it was properly licensed under Nevada law to conduct its inspections. The district court held that Chapter 645D of the Nevada Revised Statutes requires a license for the inspections Mojave conducted, and that NRS 41.600 gave Del Webb standing to challenge Mojave's practices.

Nevada statutes are interpreted according to their plain meaning "unless it clearly appears that the Legislature did not intend such a meaning." *City of Reno v. Bldg. & Constr. Trades Council of N. Nev.*, 251 P.3d 718, 722 (Nev. 2011). We must not interpret a statute to "render words or phrases superfluous or make a provision nugatory." *S. Nev. Homebuilders Ass'n v. Clark Cnty.*, 117 P.3d 171, 173 (Nev. 2005) (internal quotations omitted).

[4] The text of Chapter 645D makes its application to Mojave's inspections clear. Chapter 645D requires "[a]ny person who . . . engages in the business of, acts in the capacity of, or advertises or assumes to act as an inspector" to obtain

a certificate from the State of Nevada. NRS 645D.160(1). An "inspector" is "a person who examines any component of a structure and prepares or communicates an inspection report." NRS 645D.080. An "inspection report" is "an analysis, opinion or conclusion, regarding the condition of a structure, that is . . . [p]rovided after an inspection, in a written report, for or with the expectation of receiving compensation for the report; and . . . [d]esigned to describe and identify the inspected systems or structural components of the structure, their physical condition, any material defect and any recommendation for evaluation by another person." NRS 645D.070.

Mojave's argument that it did not provide inspection reports "with the expectation of receiving compensation for the report," *see* NRS 645D.070(1), is unpersuasive. Mojave acknowledged that its business plan was to be paid for its inspection work through the proceeds that homeowners received from the Chapter 40 claims. Mojave's contracts required the homeowner to pay its fees and expenses out of the Chapter 40 payments received from the homebuilder. The contracts assigned the homeowners' right to those payments to Mojave if the homeowners were unable to collect the full cost of inspection. Mojave did, therefore, expect ultimately to receive compensation for its inspection reports.

NRS 645D.100 contains eight express exceptions. Mojave relies on the exception for any "person who provides an estimate of cost, repair or replacement of any improvements upon real estate." NRS 645D.100(6). Mojave argues that the "[c]ost of repair or replacement estimates in construction defect claims were all Mojave's reports ultimately were used for, if they were used at all." Mojave's argument is not supported by the language of the exception, which focuses on the person who provided the inspection report and not on how the report was ultimately used. Nor is Mojave's argument supported by the record, which shows that the inspection reports identified structural deficiencies but did not provide cost estimates to

repair or replace them. The exception under section 645D.100(6) does not apply.

**[5]** Mojave's remaining arguments have no basis in Chapter 645's text. Mojave first contends that Chapter 645D applies only to inspections conducted for real-estate sales. The statute explicitly excepts certain inspections unrelated to real estate sales, which would be unnecessary if the statute covered only sales-related inspections.[4] Mojave next argues that licensed general contractors' building-code inspections do not require a Chapter 645D license. Chapter 645D explicitly excepts from its licensing requirement individuals holding licenses under Chapters 645, 645C, and 684A. NRS 645D.100(4). There is no exception for general contractors licensed under Chapter 624. *Cramer v. Nev. Dep't of Motor Vehicles*, 240 P.3d 8, 11-12 (Nev. 2010) (refusing to recognize an unenumerated exception when the statute contained enumerated exceptions).[5] Mojave's final argument is that Chapter 645D does not apply to inspections used in Chapter

---

[4]For example, NRS 645.100(4) excepts any "person licensed, certified or registered pursuant to . . . 684A of NRS while performing an act within the scope of his or her license, certification or registration." Chapter 684A addresses licensing requirements for insurance adjusters. Insurance adjustment is not typically performed in conjunction with the sale of property.

[5]Mojave argues that Chapter 645D must be read *in pari materia* with Chapter 624, which regulates general contractors, and with the assumption that general contractors and not home inspectors usually do building-code inspections. Section 624.215(5) provides: "This section does not prevent the Board from establishing, broadening, limiting or otherwise effectuating classifications in a manner consistent with established custom, usage and procedure found in the building trades." The section establishes three classifications of contractors: "general building," "general engineering," and "specialty." NRS 624.215 (2)-(4). The subsection (5) reference to "classifications" is to these three classifications and the "Board" is the State Contractors' Board. *See* NRS 624.040. Mojave has not identified any relevant regulation of general contractors. Mojave's argument that we should read Chapter 645D *in pari materia* with NRS 624.215 provides no support for excepting general contractors from the licensing requirements of Chapter 645D.

40 actions because the Nevada legislature did not intend homeowners to pay fees out-of-pocket for inspections to use in Chapter 40 actions. But Chapter 645D does not regulate the fees that inspectors charge homeowners or how those fees are paid. NRS 645D.070, the only provision that mentions compensation, simply states that Chapter 645D's requirements apply only to those inspections for which compensation is expected. The district court correctly Nevada law required Mojave to obtain licenses under Chapter 645D to perform its inspections and that Mojave misrepresented that it had the required license.

### 3.   Standing

**[6]** Mojave's argument that Del Webb lacked standing to challenge its practices is also unpersuasive. NRS 41.600(1) provides that "[a]n action may be brought by any person who is a victim of consumer fraud." *Nev. Power Co. v. District Court*, 102 P.3d 578, 583 n.7 (Nev. 2004) (per curiam). NRS 41.600(2)(e) includes in the definition of "consumer fraud" a "deceptive trade practice as defined in NRS 598.0915 to 598.0925, inclusive." NRS 598.0923(1) makes it a deceptive practice knowingly to conduct one's "business or occupation without all required state, county or city licenses."

**[7]** Mojave argues that Del Webb was not "a victim of consumer fraud" because Del Webb is neither a consumer of Mojave's services nor a business competitor. The statute does not support this argument. The statute allows "any person" who is a "victim of consumer fraud" to sue. NRS 41.600(1). The word "consumer" modifies "fraud," but does not limit "any person" or "victim." *See W. Surety Co. v. ADCO Credit, Inc.*, 251 P.3d 714, 716-18 (Nev. 2011) (declining to limit "any person" in another Nevada statutory private right of action for similar reasons). NRS 41.600(2) defines the kinds of actions that constitute "consumer fraud" not by referring to a certain type of victim, but by cross-referencing other NRS

sections defining deceptive trade practices and other offenses. *See* NRS 41.600(2).

Mojave acknowledges that a "victim of consumer fraud" need not be a "consumer" of the defendant's goods or services. *See S. Serv. Corp. v. Excel Bldg. Servs.*, 617 F. Supp. 2d 1097, 1100 (D. Nev. 2007) (allowing a business competitor to sue under NRS 41.600). Mojave argues that *Southern Service* limits NRS 41.600 standing to consumers and business competitors. *Southern Service* holds that a business competitor has standing to sue under NRS 41.600 but does not state that only consumers of a good or service or competitors providing such a good or service have standing. There is no basis in the text of NRS 41.600 or in *Southern Service* to limit standing to a group broader than consumers but no broader than business competitors.

[8] The standing issue turns on whether Mojave's business practices "directly harmed" Del Webb. *S. Serv. Corp.*, 617 F. Supp. 2d at 1099-1100. The district court found that Mojave's "illegal structural inspections and provision of reports based thereon and misrepresentations of authority to perform such services and of a relationship with Del Webb in dealing with the public has damaged Del Webb's relationship with consumers and threatens to continue to harm Del Webb's business, reputation and good will and to exposure to Chapter 40 litigation based on illegal inspections and inspection reports." Neither in its briefing nor at oral argument did Mojave challenge this finding or explain why it was insufficient to establish the direct injury needed to give Del Webb standing to sue.[6]

---

[6]Mojave contends that even if it violated Nevada law, the injunction is an unconstitutional prior restraint because the inspection reports were truthful. The challenged portion of the injunction does not prohibit Mojave from performing inspections or issuing reports. It prohibits Mojave from representing that it had a license under Chapter 645D when it did not. The First Amendment does not prohibit such an injunction. *See United States v. Estate Pres. Servs.*, 202 F.3d 1093, 1106 (9th Cir. 2000); *see also Va.*

Because Nevada law provides a basis for the specific prohibitions Mojave challenges, it is unnecessary to address whether the Lanham Act provides an additional and similar statutory basis for granting the same relief.[7] But the district court's reliance on Nevada's common law of champerty as a separate basis for the injunction does merit discussion.

## C.   Champerty and Maintenance

**[9]**  "Champerty" generally refers to an agreement in which " 'a person without interest in another's litigation undertakes to carry on the litigation at his own expense, in whole or in part, in consideration of receiving, in the event of success, a part of the proceeds of the litigation.' " *Schwartz v. Eliades*, 939 P.2d 1034, 1036 (Nev. 1997) (per curiam) (quoting *Martin v. Morgan Drive Away, Inc.*, 665 F.2d 598, 603 (5th Cir. 1982)). "Maintenance" refers to a person assisting in litigation in which he has no interest. *Vosburg Equip. v. Zupancic*, 737 P.2d 522, 523 (Nev. 1987); *see also In re Primus*, 436 U.S. 412, 424 n.15 (1978) ("Put simply, maintenance is helping another prosecute a suit [and] champerty is maintaining a suit in return for a financial interest in the outcome . . . ." ). The law on champerty and maintenance begins in antiquity with the Greek view that even a party's advocate should have a personal interest in the litigation, such as family ties. Max Radin, *Maintenance by Champerty*, 24 CAL. L. REV. 48, 48-49 (1935).[8] In feudal England, clerical opposition to litigation,

---

*State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771-72 (1976) ("Untruthful speech, commercial or otherwise, has never been protected for its own sake . . . . The First Amendment . . . does not prohibit the State from insuring that the stream of commercial information flow cleanly as well as freely.").

[7]The Nevada legislature recently amended NRS 41.600(2), explicitly allowing a court to grant "[a]ny equitable relief that the court deems appropriate." Act of May 19, 2011, § 10, 2011 Nev. Laws Ch. 60. The amendment took effect July 1, 2011. Del Webb has not argued that NRS 41.600 did not already provide for injunctive relief.

[8]*See generally* 4 WILLIAM BLACKSTONE, COMMENTARIES, *149-51 (discussing the doctrines in his chapter on "offences against public justice");

especially in secular courts; fear that lords would purchase land with clouded title to aggrandize their estates; and concerns that the wealthy would purchase meritorious claims for insignificant amounts from plaintiffs too poor to prosecute them drove royal regulation of champerty and maintenance. *Id.* at 64-66. In this country, champerty and maintenance exist under the law of many states, but the doctrines are "most visible" as a contract defense. *See* Paul Bond, Comment, *Making Champerty Work: An Invitation to State Action*, 150 U. PA. L. REV. 1297, 1304 (2002) (conducting a fifty-state survey).

**[10]** Del Webb did not assert champerty as a contract defense. Nor is Del Webb a party to the allegedly champertous agreements between Mojave and its homeowners. The district court nonetheless held that under Nevada common law, Del Webb had a valid tort claim for champerty and maintenance for which damages and equitable relief could be awarded.

**[11]** "The task of a federal court in a diversity action is to approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum." *Gee v. Tenneco, Inc.*, 615 F.2d 857, 861 (9th Cir. 1980). Federal courts should "hesitate prematurely to extend the law . . . in the absence of an indication from the [state] courts or the [state] legislature that such an extension would be desirable." *Torres v. Goodyear Tire & Rubber Co.*, 867 F.2d 1234, 1238 (9th Cir. 1989) (certifying a products liability question to the Arizona Supreme Court while recognizing the modern trend favoring expansion of products liability); *see also Ryan v. Royal Ins. Co. of Am.*, 916 F.2d 731, 744 (1st Cir. 1990) ("[L]itigants who reject a state forum in order to bring suit in federal court under diver-

Percy H. Winfield, *The History of Maintenance and Champerty*, 35 L.Q. REV. 50 (1919) (providing a historical overview of the doctrines).

sity jurisdiction cannot expect that new trails will be blazed.").

**[12]** We conclude that there was no secure basis for the district court to predict that the Nevada Supreme Court would recognize a common-law tort cause of action for damages or equitable relief asserted by a stranger to an allegedly champertous agreement.[9] The Nevada Supreme Court stated a century ago that "[t]he great weight of authority is to the effect . . . that the rule rendering contracts void for champerty, cannot be invoked except between the parties to the champertous agreement in cases where such contract is sought to be enforced." *Prosky v. Clark*, 109 P. 793, 794 (Nev. 1910). None of the Nevada Supreme Court's cases recognize champerty and maintenance as a tort. *William Lyon Homes, Inc. v. Partington*, No. 2:09-CV-0473-KJD-GSF, 2010 WL 1292296, at *1 (D. Nev. Mar. 30, 2010) ("[T]here are no reported cases supporting [champerty's] application to tort claims or other affirmative relief . . . .").[10]

---

[9]Del Webb filed a notice of supplemental authority to bring to our attention *Incline Energy, LLC v. Penna Grp., LLC*, ___ F. Supp. 2d ___, 2011 WL 1304710 (D. Nev. Apr. 1, 2011). The *Incline Energy* court explained, in *dicta*, that "[i]n addition to *providing a cause of action* to the target of a lawsuit that is moved by a champertous agreement, champerty may be raised as a defense to a contract." *Id.* at *1 n.2 (emphasis added). This decision was issued by the same court whose decision we now review and rests on the same grounds. For the same reasons set out below, we find the analysis unpersuasive.

[10]Two Nevada Supreme Court cases suggest that champerty may have a somewhat wider application than *Prosky* indicates. In *Gruber v. Baker*, 23 P. 858 (Nev. 1890), the Nevada Supreme Court suggested that champerty provides a defense by a party sued for fraud when the plaintiff's interest in the suit arises from a champertous agreement. *Id.* at 862. But twenty years later, in *Prosky*, the Nevada Supreme Court cautioned against reading *Gruber* as a champerty case, noting that the rule against transferring fraud claims "is applied even in jurisdictions which do not recognize the common-law doctrine of champerty and maintenance," and that "the great weight of authority" recognizes champerty only as a defense to a suit to enforce a champertous agreement. *Prosky*, 109 P. at 794; *see also*

The district court concluded that NRS 1.030, which provides that "[t]he common law of England, so far as it is not repugnant to or in conflict with the Constitution and the laws of the United States, or the constitution and laws of this state, shall be the rule of decision in all courts of this state," requires the application of the common law of champerty as it existed before July 3, 1776 unless the Nevada Supreme Court had expressly rejected it. NRS 1.030 does not call for the rigid application of common law as it existed before July 3, 1776. Rather, courts must interpret the common law in light of relevant conditions, which "are not the conditions which

---

*Castleman v. Redford*, 124 P.2d 293, 295 (Nev. 1942) (relying on *Prosky*'s characterization of *Gruber* as holding that "a right of action based on fraud was not assignable" and allowing a plaintiff to sue to collect assigned accounts). Cases citing *Gruber*'s discussion of champerty have only considered it as a contract defense. *Schwartz*, 939 P.3d at 1036; *Vosburg Equip.*, 737 P.2d at 523; *Lum v. Stinnett*, 488 P.2d 347, 350 (Nev. 1971). The second case is *Lum v. Stinnett*, in which the Nevada Supreme Court ordered a new trial for a defendant based on a champertous settlement agreement between the insurers of two codefendants and the plaintiff. 488 P.2d at 350. The settling codefendants remained in the case and the trial, which focused on the nonsettling defendant's liability, resulted in a verdict against that defendant in an amount that relieved the settling defendants of any obligation to pay the plaintiff. *Id.* at 348-49. The Nevada Supreme Court has since clarified that the *Lum* court was "primarily concerned about the secret and collusive nature of the agreement." *Norton Co. v. Fergestrom*, No. 35719, 2001 WL 1628302, at *2 (Nev. Nov. 9, 2001) (per curiam) (unpublished); *accord In re MGM Grand Hotel Fire Litig.*, 570 F. Supp. 913, 932 (D. Nev. 1983) ("[T]he court in *Lum* was concerned with the collusion at trial . . . ." ). Nevada law no longer prevents insurers from funding litigation to avoid liability. *Norton*, 2001 WL 1628302, at *2 (citing *NAD, Inc. v. District Court*, 976 P.2d 994, 997 (Nev. 1999)).

Neither *Lum* nor *Gruber* recognized a tort claim for champerty and maintenance. Subsequent case law developments make them poor support for expanding the doctrines. Other Nevada Supreme Court cases on champerty have not addressed whether it gives rise to a tort cause of action. *See Schwartz*, 939 P.2d at 1036-37 (holding that the challenged agreement was not champertous because the plaintiff had an interest in the suit); *Vosburg Equip.*, 737 P.2d at 523-24 (same); *Aeroville Corp. v. Lincoln Cnty. Power Dist. No. 1*, 290 P.2d 970, 972 (Nev. 1955) (same).

existed when the United States Constitution was adopted, or when Nevada gained statehood, or even when NRS 1.030 was first enacted, but conditions which exist today." *Rupert v. Stienne*, 528 P.2d 1013, 1017 (Nev. 1974).

Nevada courts have long recognized that many of the conditions recognized as the basis for champerty and maintenance regulation no longer exist. The first Nevada Supreme Court case considering champerty acknowledged that the "English doctrine of maintenance arose from causes peculiar to the state of society in which it was established," and that although once "rigorously enforced, . . . this rigor has . . . been relaxed [because] . . . [t]he apprehension that justice would be trodden down if property in action should be transferred is no longer entertained." *Gruber*, 23 P. at 862. The *Prosky* court similarly recognized that "[t]he reason for the enactment of the English statutes of champerty and maintenance ha[d] very largely ceased to exist." *Prosky*, 109 P. at 794. The *Prosky* court explained, as noted above, that "the great weight of authority" recognizes champerty and maintenance only as a defense to enforcing a champertous agreement. *Id.*

The *Gruber* court noted that legal reforms such as the statute of frauds and statute of limitations "have all taken place since the law of maintenance was enacted; and all these have contributed to prevent groundless and vexatious litigation." *Gruber*, 23 P. at 862. Nevada has enacted statutes, rules, and codes of conduct that serve purposes previously addressed by the doctrines of champerty and maintenance. *See* NEV. R. CIV. P. 11; NEV. R. PROF'L CONDUCT 3.1 (requiring attorneys not to "defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous"); *D.R. Horton, Inc. v. Green*, 96 P.3d 1159, 1162 (Nev. 2004) (recognizing unconscionability as a bar to a contract's enforcement). Other state courts have relied on similar developments to abolish champerty and maintenance altogeth-

er.**11** These developments make it even more difficult to predict that the Nevada Supreme Court would recognize champerty as an affirmative tort.

**[13]** The consistent trend across the country is toward limiting, not expanding, champerty's reach.**12** *See, e.g., Toste Farm Corp. v. Hadbury, Inc.*, 798 A.2d 901, 905 (R.I. 2002) (collecting cases).**13** Some states have squarely rejected tort claims based on champerty.**14** Other states have refused to recognize champerty as anything more than a defense by a party to enforcement of the allegedly champertous agreement, implicitly rejecting a broader tort remedy.**15** "Only a handful

---

**11***See, e.g., Osprey, Inc. v. Cabana L.P.*, 532 S.E.2d 269, 277 (S.C. 2000) ("We are convinced that other well-developed principles of law can more effectively accomplish the goals of preventing speculation in groundless lawsuits and the filing of frivolous suits than dated notions of champerty."); *Saladini v. Righellis*, 687 N.E.2d 1224, 1226-27 (Mass. 1997) ("We also no longer are persuaded that the champerty doctrine is needed to protect against the evils once feared: speculation in lawsuits, the bringing of frivolous lawsuits, or financial overreaching by a party of superior bargaining position. There are now other devices that more effectively accomplish these ends."); *McCullar v. Credit Bureau Sys.*, 832 S.W.2d 886, 887 (Ky. 1992) ("Modern remedies for damages are to be pursued through such tort actions as malicious prosecution, abuse of process, or wrongful initiation of litigation. The champerty doctrine remains viable only as a defense in contract actions.").

**12***See Prosky*, 109 P. at 794 (looking to other jurisdictions to determine the scope of champerty); *cf. State v. Weddell*, 43 P.3d 987, 992 (Nev. 2002) (construing a statute in light of the court's "concern that the rationale for the rule at common law no longer exists" and "the abandonment of this common law rule in other states").

**13**In *Toste Farm*, the Rhode Island Supreme Court left it to the legislature to overrule previous decisions defining the scope of champerty. *Toste Farm*, 798 A.2d at 905-06. We are aware of no recent case that has enlarged champerty's role beyond that already accepted in the jurisdiction.

**14***E.g., Alexander v. Unification Church of Am.*, 634 F.2d 673, 678 (2d Cir. 1980), *abrogation on other grounds recognized by PSI Metals, Inc. v. Firemen's Ins. Co.*, 839 F.2d 42, 43 (2d Cir. 1988) (per curiam); *Sec. Underground Storage, Inc. v. Anderson*, 347 F.2d 964, 969 (10th Cir. 1965); *Tosi v. Jones*, 685 N.E.2d 580, 583 (Ohio Ct. App. 1996).

**15***Sneed v. Ford Motor Co.*, 735 So. 2d 306, 315 (Miss. 1999) ("It is the champertous contract and not the right of action itself which the contract

of cases have applied maintenance and champerty as torts in the United States in the last one hundred years." VICKI WAYE, TRADING IN LEGAL CLAIMS 14 (2008). Even those cases have sharply limited the scope of the tort they recognized. Under North Carolina law, for example, an assignment of a claim is not champertous unless the assigned claim is a tort claim; the assignment gives a stranger to the claim control of that claim, not merely the right to any proceeds; and the purpose, not merely the effect, of the stranger's involvement is to stir up litigation. *See Charlotte–Mecklenburg Hosp. Auth. v. First of Ga. Ins. Co.*, 455 S.E.2d 655, 657 (N.C. 1995); *Odell v. Legal Bucks, LLC*, 665 S.E.2d 767, 775 (N.C. Ct. App. 2008). "[A]n outsider's involvement in a lawsuit does not constitute champerty or maintenance merely because the outsider provides financial assistance to a litigant and shares in the recovery." *Odell*, 665 S.E.2d at 775. Illinois law requires the allegedly improper agreement to have caused meritless litigation. *Medallion Prods., Inc. v. H.C.T.V., Inc.*, No. 06 C 2597, 2007 WL 1022010, at *4 (N.D. Ill. Mar. 29, 2007) (citing *Weigel Broad. Co. v. Topel*, No. 83 C 7921, 1985 WL 2360, at *6 (N.D. Ill. Aug. 21, 1985)). As noted, no Nevada state court has recognized even such a limited tort. The district court's approach nonetheless predicts that the Nevada Supreme Court would recognize a tort action for champerty that would be among the country's most expansive.

**[14]** There was no adequate basis, in short, for the federal district court, applying Nevada law, to recognize a tort claim

avoids, and, therefore, defendant cannot avail himself of the champertous agreement as a defense to the action." (quoting *Calhoun Cnty. v. Cooner*, 118 So. 706, 707 (Miss. 1928))); *Robertson v. Town of Stonington*, 750 A.2d 460, 463 (Conn. 2000) (citing *Perry v. M.M. Puklin Co.*, 123 A. 28, 30 (Conn. 1923)); *Rolleston v. Cherry*, 487 S.E.2d 354, 359 (Ga. Ct. App. 1997) (citing *Ellis v. Smith & Bussey*, 37 S.E. 739, 742 (Ga. 1900)); *Agar Sch. Dist. No. 58-1 Bd. of Educ. v. McGee*, 527 N.W.2d 282, 288 (S.D. 1995); *Mitchell v. Amerada Hess Corp.*, 638 P.2d 441, 445 (Okla. 1981) (citing *Aaronson v. Smiley*, 285 P. 59, 61 (Okla. 1929)).

for champerty as a basis for issuing the injunction in this case. Although the injunction is affirmed in part, that affirmance is not based on the district court's conclusion that the common law of champerty supported this relief.

The district court's injunction is **VACATED** in part and **AFFIRMED** in part.

Each party will bear its own costs on appeal.