B&B BUCKLES PROPERTIES v. OIL PRODUCERS INC. OF KANSAS
2022 OK CIV APP 34
Case Number: 119137
Decided: 10/19/2021
Mandate Issued: 10/12/2022
DIVISION IV
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION IV
Cite as: 2022 OK CIV APP 34, __ P.3d __

 
B&B BUCKLES PROPERTIES, LLC, Plaintiff/Appellant,
v.
OIL PRODUCERS INC. OF KANSAS; BLUESTEM OIL & GAS, LLC; JON CHRISTENSEN; SUE ANN CONERLY; D. MARIE RESOURCES, INC.; DAVLYN CORPORATION; DELTA GOLD, INC.; DURNATH CORPORATION; MELODY C. FLETCHER; GEOSTONE RESOURCES, INC.; J. DURWOOD PATE TRUST; L&J OIL PROPERTIES, INC.; LEEMAN ENERGY CORPORATION; LEON O. BUTNER TRUST; DAVID AND JANENE MALLEY; MOHICAN PETROLEUM, INC.; JAMES D. PATE, JR.; STOABS OIL CORP.; CHERI SWARTZENDRUBER; JAMES W. SWARTZENDRUBER; JAMES W. SWARTZENDRUBER, PERSONAL REPRESENTATIVE OF THE ESTATE OF TRACY R. SWARTZENDRUBER, DECEASED; KRIS S. SWARTZENDRUBER; JOHN C. SWARTZENDRUBER; TIP TOP OIL & GAS US, LLC; VIRGIL JURGENSMEYER TRUST; CHESAPEAKE EXPLORATION, LLC; AMPLIFY OKLAHOMA OPERATING LLC F/K/A MIDSTATES PETROLEUM COMPANY, LLC, Defendants/Appellees.
APPEAL FROM THE DISTRICT COURT OF
WOODS COUNTY, OKLAHOMA
HONORABLE MICKEY J. HADWIGER, TRIAL JUDGE
AFFIRMED IN PART, DISMISSED IN PART
Cody J. McPherson, MAHAFFEY & GORE, P.C., Oklahoma City, Oklahoma, and
Jana L. Knott, BASS LAW, Oklahoma City, Oklahoma, for Plaintiff/Appellant
William A. Johnson, Elizabeth A. Price, HARTZOG CONGER CASON, LLP, Oklahoma City, Oklahoma, for Defendants/Appellees
STACIE L. HIXON, PRESIDING JUDGE:
¶1 Plaintiff B&B Buckles Properties, LLC (Buckles) appeals judgment following non-jury trial entered in favor of operator, Oil Producers, Inc. of Kansas (OPIK), and a group of lessees or working interest owners holding an interest in an oil and gas lease (collectively, Defendants). Below, Buckles contended that Defendants breached the implied covenant to further develop the Lease, to which Buckles was a successor in interest, by failing to drill a horizontal well and sought cancellation of the Lease. OPIK attempted to comply with Buckles' demand. An operator dispute arose between OPIK and Defendant Midstates Petroleum Company which prevented a horizontal well from being drilled. Midstates acquired a working interest in the well after initiating that dispute.
¶2 The trial court found that Buckles did not establish that Defendants failed to act as a reasonably prudent operator, with the exception of Midstates, that Defendants were not liable for the breach, and that Buckles was not entitled to cancellation of the Lease, an order requiring a horizontal well be drilled, or money damages. Buckles appeals the trial court's refusal to cancel the Lease. Alternatively, Buckles appeals an interlocutory minute order denying approval of a partial settlement between Buckles and a portion of the Defendants. Based on our review of the facts and applicable law, we affirm the trial court's judgment of September 18, 2020. We dismiss Buckles' appeal of denial of the motion to approve settlement for lack of an appealable order.
BACKGROUND
¶3 Buckles acquired mineral interests located in Section 4-25N-13 in Woods County in 2011, and is successor in interest to rights of lessors in an oil and gas lease dated February 16, 1981 known as the Murrow Lease (Lease). Section 4 was designated by the OCC as a 640-acre drilling and spacing unit. OPIK is the successor operator of the Unit under a Joint Operating Agreement dated August 24, 1983.
¶4 At the time Buckles acquired its interest in Section 4, OPIK operated a vertical well in Section 4, the Murrow #1, which produced in paying quantities. In 2013, Buckles expressed a desire to OPIK that it drill a horizontal well or wells in Section 4. A number of horizontal wells have been drilled in sections surrounding Section 4. Numerous witnesses testified at trial that a horizontal well or wells were needed in Section 4 to fully capture reserve minerals in that section.
¶5 In late 2013, OPIK alerted its working interest partners that a royalty interest owner (Buckles) insisted on horizontal development and that they would receive a proposal in the first quarter of 2014. In January 2014, Buckles made formal written demand on OPIK and non-operating working interest owners to further develop the Mississippian formation within thirty days.
¶6 OPIK negotiated a potential farm-in agreement with CMX, Inc. to drill a horizontal well. That proposal, dated February 10, 2014, provided, among other things, that CMX would drill a well in the Mississippian formation and an Arbuckle disposal well no later than June 15, 2014. CMX would receive 85% of the gross working interest, from which 10% would be assigned to Creek Real Estate Investment ("Creek") (affiliated with OPIK). CMX would carry the capital costs of the first well for all working interest owners. CMX would carry the second well for Creek, but all other working interest owners would be treated on a heads up basis for subsequent wells (i.e., working interest owners would participate in costs according to their proportionate interests). OPIK negotiated the additional 10% as consideration for assigning its interest as operator to CMX.
¶7 Buckles initially approved of CMX's proposal. However, a group of working interest owners known as the Pate Group (Pate) disagreed with the 10% interest to be assigned to Creek, and the carry of Creek on two wells. James Pate contended that this type of commission was not industry standard, and that all working interest owners should be treated on a "heads up," or equal basis. Pate also believed the agreement was not favorable because CMX would need to expend $2,000,000 to establish the infrastructure necessary to support production from a horizontal well, plus the cost to drill a saltwater disposal well. CMX attempted to improve its offer in March 2014, but Pate did not consider it because it had reached an agreement with another entity, Midstates.
¶8 Mr. Pate contacted other entities to drill a horizontal well in Section 4, but contended none were interested, other than CMX and Midstates, because of the cost of the infrastructure. Mr. Pate agreed to a deal with Midstates that required no commission to OPIK and promised free saltwater disposal. Mr. Pate testified he agreed with Midstates that all working interest owners would receive the same agreement.
¶9 Midstates submitted proposals to OPIK and the other working interest owners in March 2014. Contrary to Mr. Pate's understanding, OPIK did not receive the same proposal as the other working interest owners. Midstates' proposal required OPIK to give up its rights in all formations, including the Mississippian, made no provision for salt water disposal, and, in OPIK's view, essentially asked OPIK to walk away from Section 4. Mr. Pate testified he was not aware the offers were different until just before trial, and that he would not have accepted the deal in OPIK's place. OPIK was not aware the offers were different, and did not accept Midstates' proposal.
¶10 Drilling a horizontal well within the Unit required a location exception from the OCC. After submitting its proposal and without consent or knowledge of OPIK, Midstates filed a cause with the OCC for a location exception on March 28, 2014, alleging that Midstates held the right to drill in the Unit. At that time, Midstates was not a lessee and held no ownership interest in Section 4. OPIK protested and filed its own cause for location exception on April 2, 2014. Certain working interest owners then contested OPIK's application. The OCC consolidated those causes, which were not resolved amid the dispute between Midstates and OPIK.
¶11 After filing at the OCC, Midstates issued ballots to working interest owners to remove OPIK as the operator. Pate voted to remove OPIK. On May 29, 2014, Midstates represented to OPIK via correspondence that it owned over 50% of the working interest in Section 4, and that it had received votes of 74.36% of the working interest owners to remove OPIK as the operator, pursuant to the authority of the Joint Operating Agreement (JOA), and demanded OPIK step aside. However, the JOA did not provide for OPIK's removal of the operator by ballot. On June 9, 2014, OPIK filed suit in district court to declare OPIK as the rightful operator. Midstates filed competing litigation on August 14, 2014. Around that time, Midstates acquired an interest in Section 4 through an assignment by another defendant.
¶12 During the operator dispute, CMX's proposal expired and CMX did not wish to pursue development of the Unit during the dispute. OPIK'S representative testified that OPIK attempted to find another entity willing to drill a horizontal well in Section 4, but none were interested because of the pending litigation, and later, economic circumstances. She also testified that OPIK repeatedly tried to settle the operator dispute with Midstates and reached an agreement early 2016 that Midstates then declined to sign. In the interim, OPIK drilled a vertical well in October 2014, the Murrow #2, which did not require a location exception. Buckles received royalties from that well.
¶13 In addition to the operator dispute, oil prices dropped in 2014. Defendants' expert testified that, while the price of gas was high in spring 2014, it collapsed over the next few months, impacting the viability of the well and drilling activity. He contended that the economic viability of the well was significantly less six months after Buckles' January demand letter. Pate testified that by October 2014, a horizontal well would not have been commercially viable. OPIK's COO testified that, by the end of 2014, a significant economic downturn meant that the economics for horizontal drilling were not there. The only entity interested in drilling the Unit after the collapse of oil prices was Midstates. However, Midstates withdrew its agreement with Pate and other working interest owners in August 2015, noting that OPIK had decided not to press its claims in the operator dispute for the time being due to low commodity prices. At trial, the parties (apart from Buckles) appeared to acknowledge that a horizontal well was no longer economical following the collapse of oil prices in late 2014 and 2015. The competing legal proceedings sat dormant, due to apparent lack of interest in drilling the well.
¶14 Buckles filed the underlying action in August 2016 against OPIK and the working interest owners, asserting claims for breach of the covenant of further development, breach of the covenant to protect from offset drainage, underpayment of royalties and violation of the Production Revenue Standards Act, sought to quiet title in the mineral interests, actual and punitive damages, and to cancel the Lease. Buckles dismissed all non-quiet title/lease cancellation claims against Midstates in February 2015. Following bankruptcy, Midstates was succeeded by Amplify Operating, LLC, and is no longer involved in the Unit. Despite various amendments and cross-claims, the only issue remaining for trial by 2019 was Buckles' claim for breach of the implied covenant of further development.
¶15 Following two day bench trial, the trial court issued detailed Findings of Fact and Conclusions of Law on September 4, 2020, which it incorporated into its judgment. Among other things, the trial court determined that, but for the operatorship dispute, a prudent operator would have drilled a horizontal well in early 2014. However, the trial court determined that a prudent operator would not commence a multimillion dollar horizontal well as long as operatorship was in dispute, and that, while the Murrow #2 vertical well could not capture all reserves, OPIK had acted as an ordinary prudent operator by drilling that well while horizontal drilling was blocked by the dispute. With respect to Midstates, the court found that Midstates' offer to OPIK was unconscionable and could not have been in good faith, that OPIK had no obligation to accept it, and that Midstates' actions were a major contributing factor to creating the dispute that resulted in a horizontal well not being drilled when it was still economical to drill. As to the other working interest owners, the court found that the working interest owners had the right to reject the CMX offer and look elsewhere and that Pate had not known that Midstates had made a different offer to OPIK, contrary to their agreement. The court found no party, other than Midstates, had breached the covenant. The trial court's September 18, 2020 judgment states that Buckles:
. . . did not establish that OPIK and the working interest owners, with the exception of MidStates, failed to act as a reasonably prudent operator in its operation of the Morrow [sic] Unit. Accordingly, Defendants are not liable for breach of the implied covenant of further development, and Plaintiff is not entitled to the equitable relief of lease cancellation, nor an order of the Court requiring the Defendants to drill one or more horizontal wells, nor money damages.
¶16 Buckles appeals.
STANDARD OF REVIEW
¶17 Buckles' demand to cancel the Lease is a matter of equitable cognizance requiring two standards of review. Hall v. Galmor, , ¶ 11, . "We will not reverse the trial court's factual findings or ultimate decision unless they are clearly against the weight of the evidence." Id. at ¶ 12. "[I]n an equitable proceeding, where the evidence is in conflict, the findings of the trial court will not be set aside unless, after a consideration of the entire record, it appears that such findings are clearly against the weight of the evidence." Id. (citation omitted). "It is for the trial court in a case of equitable cognizance to determine the credibility of the witnesses and the weight and value to be given to the testimony." Id. However, we review issues of law de novo according to the Court's "plenary, independent and non-deferential authority to reexamine a trial court's legal rulings." Id. at ¶ 13.
ANALYSIS
A. Application of the Prudent Operator Standard
¶18 Buckles contends the trial court erred by holding Defendants were not in breach of the implied covenant to further develop because it found a prudent operator would have drilled a horizontal well in Section 4, but for the operator dispute. Buckles reasons that the operator dispute could not be considered under the objective standard of a reasonably prudent operator and that the trial court should have held Defendants breached the covenant.
¶19 Oklahoma law recognizes an implied covenant to fully develop within an oil and gas lease. See e.g. Doss Oil Royalty Co. v. Texas Co., , . "A court of equity will declare forfeiture of the undeveloped portion of a producing oil and gas lease because of the breach of implied covenant to diligently develop the property when the forfeiture will effectuate justice, but the granting of such relief depends upon the facts and circumstances surrounding the particular case." Id. at ¶ 0 (syllabus 2). The lessor bears the burden of demonstrating a breach. Texas Consol. Oils v. Vann, , ¶ 26, . Further, "it is a settled rule that the lessor must demand that an implied covenant be complied with before a court of equity will grant a forfeiture." Mitchell v. Amerada Hess Corp., , ¶ 16, . Parties privy to the lease to be cancelled must make that demand. Id.
¶20 Whether the implied covenant has been breached is determined according to the "prudent operator standard." The question is, "would a prudent operator, having due consideration for the interest of both the lessee and the lessor, considering all factors, including what is known about the market, the geology and adjoining activity, drill the proposed well." Mitchell, , at ¶ 17. Factors courts have considered include "[p]robable costs of drilling, equipping and operating the well or wells," "that oil or gas would probably have been discovered thereon," and that "the amount thereof would probably have been sufficient to have yielded a reasonable profit upon the total outlay." Union Oil Co. of Cal. v. Jackson, , ¶ 22, . Profitability, or expectation of profit, is an essential element of the prudent operator standard. Mitchell, , at ¶ 22. Nothing under the foregoing case law states these factors are an exhaustive list of what the trial court may consider under the prudent operator standard.
¶21 Though Buckles devotes significant attention to arguing that a horizontal well would have been profitable at the time of its demand, that issue does not appear to be genuinely in dispute. That issue is also not the dispositive consideration on appeal. Rather, Buckles' proposition concerns the scope of facts the trial court could properly consider when applying the prudent operator standard.
¶22 Buckles contends that the operator dispute is a subjective or "peculiar" concern of OPIK that may not be considered in assessing, objectively, whether a prudent operator would have drilled a horizontal well. The only considerations Buckles acknowledges are relevant to the prudent operator standard are whether it was possible to drill a well, and whether the well would be profitable, i.e., the economics, geology, adjoining activity and knowledge and skill available to drill. Any fact outside of these, including the operator dispute, must apparently be disregarded, in Buckles' view.
¶23 Buckles cites no authority from an Oklahoma court, or any other, supporting its position, or restricting a court from considering an operator dispute in applying the prudent operator standard. Instead, Buckles relies on a paper positing that the prudent operator standard is defined by a "hypothetical operator, not the real operator." David E. Pierce, "Implied Covenant and Horizontal Development," Horizontal Oil & Gas Development, Paper No. 7, Page No. 7-4 (Rock ML Min. L. FDN. 2012). There, the author proposes that "the real operator may be short on cash. The real operator may have other obligations, under other leases, that demand more immediate attention. The real operator may want to spend money developing oil prospects instead of further developing the lessor's lease . . . ." Id.
¶24 According to the author, whether a well should have been drilled must be assessed not by whether it was proper for "this defendant to do, given his peculiar circumstances, but what a hypothetical operator acting reasonably would have done, given circumstances generally obtained in the locality," without regard to whether a particular defendant is short on cash, over-committed elsewhere, or prefers to spend its money on other things. Buckles extends this reasoning beyond the text of the paper to suggest that an operatorship dispute is also a subjective consideration of the operator alone that is not to be considered.
¶25 Buckles does not harmonize this extrapolation with Oklahoma jurisprudence requiring the prudent operator to "do whatever in the circumstances would be reasonably expected of operators of ordinary prudence . . . ." Vann, , at ¶ 30 (emphasis added). Buckles is also silent as to how the prudent operator is to give "due consideration for the interest of both the lessee and the lessor, considering all factors," if it may consider nothing but the bare viability of a well, without regard to all surrounding circumstances. Id. (emphasis added). Defendants do not address this aspect of Buckles' argument. Independent research locates no authority applying the prudent operator standard under analogous circumstances, or in the manner suggested by Buckles.
¶26 Buckles' interpretation and application of an "objective" standard to omit consideration of an operator dispute or other legal impediment to developing the Lease in question is an incorrect application of "subjective" and "objective" concepts and the prudent operator standard set forth under Oklahoma law. The question here is what facts were relevant to a trial court's evaluation of whether or how the prudent operator would develop the lease. The prudent operator standard is a "measuring stick" to determine the diligence required of a lessee; it is an equitable principle, and thus not inflexible. Vann, , at ¶ 45. The standard appears flexible enough to consider an operator dispute or other legal impediment, as relevant to the ability to drill and the interest of both a lessee and lessor.
¶27 Here, the record reflects that the operator dispute hindered drilling a horizontal well on the Lease. This operator dispute is relevant to assessing Defendant's conduct, in comparison to that of a prudent operator acting under similar circumstances. For these reasons, the Court finds the trial court did not err by considering the operator dispute in determining whether Defendants failed to act as prudent operators.
B. The Weight of the Evidence at Trial 
¶28 Buckles also proposes that, even if the operatorship dispute is properly considered, the trial court's determination that Defendants did not breach the implied covenant of further development is against the clear weight of the evidence. One, Buckles contends that OPIK was in breach of the implied covenant well before its demand in 2014. Two, Buckles contends that OPIK's failure to reach an agreement to drill prior to the operator dispute and the dispute itself were attributable to OPIK and other Defendants, and require a finding Defendants were in breach. The Court disagrees with Buckles' interpretation of the record and applicable law. Further, even if Defendants breached the covenant, Buckles has not established, or even addressed, whether the trial court's denial of the equitable relief of cancelling the Lease was clearly against the weight of evidence.
¶29 First, Buckles' reliance on evidence it contends demonstrates Defendants were in breach of the implied covenant years before its 2014 demand is unavailing. "[A]n action to cancel an oil and gas lease is but an action in equity to cancel a contract." Mitchell, , ¶ at 16. "[I]t is a settled rule that a lessor must demand that an implied covenant be complied with before a court of equity will grant a forfeiture." Id. Not only must the lessor make a demand but he must provide reasonable time for compliance thereafter. See James Energy Co. v. HCG Energy Corp., , ¶ 17, .
¶30 The trial court applied the foregoing authority, and considered Defendants' alleged breach from the date of Buckles' demand in January 2014. We reject Buckles' proposition that failure to drill a horizontal well prior to its demand was evidence requiring the trial court to find Defendants breached the implied covenant, or that it required cancelling the Lease.
¶31 Next, Buckles argues that the record shows OPIK and Pate failed to act prudently in the months between its demand and the operator dispute. As summarized above, OPIK began seeking proposals to drill a horizontal well before Buckles' written demand to further develop, and procured a proposal from CMX to drill a horizontal well shortly thereafter. CMX and Midstates were the only entities who ever expressed an interest in drilling in Section 4, and Midstates did not return OPIK's calls during this period. In the CMX proposal, OPIK negotiated a 10% commission for Creek, to be taken from CMX's interest, in exchange for giving up its role as operator. The trial court found there was nothing unlawful or wrongful about that proposal, though it found Pate was within its rights to seek a better deal. The conclusion that OPIK acted prudently during this period is not clearly against the weight of the evidence.
¶32 Meanwhile, Midstates was the only other entity to propose drilling a horizontal well in Section 4. The record supports the trial court's conclusion that it was not unreasonable for one in Pate's position to seek a better deal, given the commission and the cost of infrastructure necessary for CMX to drill in Section 4. Further, while Midstates' proposal was acceptable to Pate and the working interest owners, the record also supports that Midstates' different proposal to OPIK was unfavorable, or "unconscionable," and that OPIK was not obligated to accept it. The record also supports the trial court's conclusion that Pate had no knowledge that Midstates' offer to OPIK differed, and concluding that Pate, or one in Pate's position, would reasonably believe Midstates' proposal should be supported. At the very least, the conclusion that neither breached the implied covenant during this period is not clearly against the weight of evidence.
¶33 Buckles also contends that Midstates, OPIK and Pate together created the operator dispute, and that Pate and OPIK therefore did not act as a reasonably prudent operator. Again, the trial court's conclusion to the contrary is not against the weight of the evidence. Before holding any interest in the Lease, Midstates filed a competing cause for location exception at the OCC, preventing OPIK from obtaining authorization to drill a horizontal well. Midstates then attempted to remove OPIK (through a balloting process not expressly authorized by the JOA), on the apparent basis that OPIK failed to accept Midstates' unfavorable proposal. OPIK filed litigation to resolve the operator dispute. OPIK's representative testified at trial that it repeatedly attempted to settle the dispute with Midstates, to no avail. Buckles has pointed to no fact of record that suggests OPIK created the operator dispute, or failed to act as a prudent operator would in its attempt to resolve it.
¶34 With respect to Pate, the trial court determined that Pate was within its rights to seek a better deal, had negotiated that all parties receive the same proposal from Midstates and was thus unaware of Midstates' "unconscionable" proposal to OPIK. One might argue that Pate acquiesced to Midstates' attempt to remove the operator through a method not authorized by the JOA. However, like OPIK, Pate attempted to procure a farm in deal to meet its obligation to develop the Lease. Pate was unaware that OPIK had reason to reject Midstates' offer at the time it voted in favor of Midstates' attempt to remove OPIK as operator. Given the surrounding circumstances, the determination that Pate acted as a prudent operator is not clearly against the weight of evidence.
¶35 As to Midstates, it did not acquire an interest in Section 4 until it filed competing litigation to resolve the operator dispute in August 2014, after its proposal, attempt to remove OPIK as operator and filing for location exception at the OCC. While the trial court states that Midstates failed to act as a prudent operator, its breach of the implied covenant would have occurred in the relatively brief period between August 2014 and when oil practices crashed in the later part of the year. By the time of trial, Midstates had filed bankruptcy, had merged with another company, and was no longer participating in the Unit. Buckles had dismissed all claims for damages against Midstates, but for its claim to cancel the Lease and quiet title.
¶36 Equity will declare a forfeiture following breach of an implied covenant "when such forfeiture will effectuate justice," but that relief depends on the circumstances. Ramsey Petroleum Corp. v. Davis, , ¶ 5, . Under the totality of these circumstances, the determination that forfeiture would not effectuate justice, despite Midstates' failure to act as a prudent operator, is not against the weight of evidence.
¶37 Buckles also argues that the workings interest owners' obligations under the Lease were indivisible, and that any finding that Midstates did not act as a prudent operator requires a determination that all Defendants breached the implied covenant, compelling the Lease to be cancelled. In support, Buckles cites authority which provides that the assignment of a lease, in whole or in part, does "not relieve the assignee from developing the property according to the express and implied covenants of the lease." Dixon v. Anadarko Prod. Co., , ¶ 7, (citing Amerada Petroleum Corp. v. Sledge, , ¶ 33, )("[T]he division of the lease or an assignment of a part thereof will not relieve the lessee or his assigns from developing the property according to the express and implied covenants of the lease.").
¶38 Because the obligation under the Lease is indivisible, Buckles reasons that a breach by Midstates must be imputed to other Defendants. However, Buckles' argument ignores a key component to the consideration of whether a lease should be cancelled, regardless of whether one or even all of Defendants are in breach. Cancellation of a lease is an action in equity. Though Buckles treats a breach by any one Defendant as an entitlement to cancellation as a matter of law, the trial court may only cancel a lease to effectuate justice. Whether only Midstates or all Defendants failed to act as a prudent operator, nothing required the trial court to cancel the Lease in equity. Entitlement to that relief depends on the circumstances of the case.
¶39 Under the facts of record, the Court declines to hold that the trial court's refusal to cancel the Lease was inequitable, or against the weight of evidence. As the Doss court recognized, "courts and text writers condemn . . . attempts of lessees to so indefinitely free the undeveloped portions of oil and gas leases, hold them for speculative purposes, and thus prevent the owners from getting full development of their land." , at ¶ 11. Cancellation is appropriate in light of these concerns, when equity demands. However, in this case, Defendants did not sit on the Lease after Buckles' demand to further develop, despite the problems created by the competing proposals and Midstates' actions. OPIK made efforts to resolve the dispute with Midstates over operatorship, and attempted to find other entities to drill a horizontal well, though unsuccessful. In the interim, OPIK, with sufficient support from working interest owners, drilled the Murrow #2 vertical well to further develop the Lease. Buckles' arguments fail to take into account the unique and detailed fact pattern of this case, and the required application of equitable principles to its demand for cancellation. We find no error and affirm the trial court's judgment.
C. The Motion to Approve Settlement Agreement 
¶40 Buckles requests that, if the Court does not reverse the trial court's judgment, that it alternatively hold the trial court erred by failing to enforce a partial settlement agreement between Buckles and Pate reached before trial. This argument has not been reduced to an appealable order, or otherwise preserved for appeal.
¶41 On October 5, 2018, Buckles and Pate filed a Joint Motion for Entry of Order Approving Settlement Agreement, which purportedly reached a partial settlement agreement between the two parties. OPIK objected that unanimous consent of all working interest owners party to the JOA was required to approve the settlement of a joint liability. Buckles did not include an order denying the motion in the record and points us to no appealable order in its briefing. The trial court's docket reflects only a minute order denying the motion on January 31, 2019. Buckles thus appeals from a non-reviewable interlocutory minute order. "It does not fit into any category of interlocutory orders appealable by right. Nor may it be deemed final because it 'precluded plaintiff from proceeding further' or 'prevented a judgment.'" Lawson v. Boston Chrysler, Plymouth and Dodge, Inc., , ¶ 5, .
¶42 Further, motions to enforce settlement are generally treated as motions for summary judgment. Russell v. Bd. County Comm's., , ¶ 7, . Denial of a motion for summary judgment is not appealable interlocutorily or after a trial on the merits. Myers v. Missouri Pacific R. Co., , ¶ 39, . Ordinarily, denial of a summary judgment simply means that factual disputes remain and will be addressed by further proceedings. Denial of such a motion is not final, and does not prevent the party from pressing that issue through trial, or relieve them of any duty to do so, should they contend they are entitled to judgment as a matter of law.
¶43 Though we cannot ascertain the basis of the trial court's denial of the motion to approve in this case, trial on the merits was available to resolve any disputes of fact necessary to rule upon the motion. Additionally, procedural mechanisms were available through trial to allow Buckles and Pate to press their entitlement to judgment as a matter of law. They did not do so. Enforcement or approval of the settlement agreement was not raised as an issue for trial in the pretrial order. Settlement was not offered as grounds for demurrer or directed verdict on any claim, and is not found within the parties' proposed findings of fact and conclusions of law, or in the judgment entered by the trial court. As a result, Buckles has failed to obtain an appealable ruling, and its appeal on this point is hereby dismissed.
CONCLUSION
¶44 For the foregoing reasons, we affirm the trial court's Judgment in favor of Defendants, dated September 18, 2020. We dismiss Buckles' appeal of the denial of its joint motion to enforce a partial settlement agreement between it and Pate.
¶45 AFFIRMED IN PART, DISMISSED IN PART.
FISCHER, V.C.J., concurs, and RAPP, J., concurs in result.
 
FOOTNOTES
 Defendant Amplify Oklahoma Operating LLC f/k/a Midstates Petroleum Company ("Midstates") has not entered an appearance in this appeal. Buckles dismissed all claims for monetary damages against Midstates prior to trial, reserving only its claim for quiet title and lease cancellation. Buckles and Midstates stipulated prior to trial that Midstates would not participate, that Buckles would not seek monetary damages, and that Midstates would abide by the result reached in the trial, among other concessions not addressed herein. Chesapeake Exploration, LLC also agreed to be bound by the verdict, and did not participate in trial or on appeal.
 Buckles demanded that OPIK release its lease in July 2013, claiming the lease was no longer held by production, and filed a separate suit on this basis which it dismissed in January 2014. Its demand for further development was submitted within a few days of the dismissal.
 OPIK does not have experience itself in drilling horizontal wells.
 Buckles testified it meant that OPIK was to start the process of getting a well drilled within thirty days. Buckles did not specify that development must be horizontal, though its desires appear to have been understood.
 OPIK's representative believed the deal would be acceptable because of the carry of the first well and the infrastructure.
 The Pate Group consisted of Defendants Geostone Resources, Inc., Durnath Corporation, Davlyn Corporation, J. Durwood Pate Revocable Trust, James D. Pate, Jr.,
James W. Swartzendruber, D. Marie Resources, Inc., David Malley, Janene Malley, Stoabs Oil Corporation, L&J Oil Properties, Inc., and Leeman Energy Corporation.
 Horizontal wells generate salt water, which requires three-phase electricity to draw from the ground, as well as means of disposal, which CMX did not already have in the area.
 Midstates had drilled horizontal wells in the area and possessed the necessary infrastructure.
 OPIK took this to mean that it would be charged for salt water disposal. Id. The record reflects that disposal of salt water is a valuable feature to an agreement.
 At trial, Midstates contended its interest arose from letter agreements with other working interest owners to acquire an interest and drill, should it become operator. Its corporate representative testified he had seen these agreements, but they are not found in the trial court record. The trial court concluded that "Midstates did not have signed, written agreements with any of the working interest owners in the Unit at the time of the filing of its Application and therefore was a stranger to title."
 Midstates' representative, Presnall, admitted the JOA did not provide for removal of the operator by ballot.
 Case No. CV-14-1022 (Okla. County).
 Midstates filed for bankruptcy in 2016 and underwent a change in leadership, though it did not sign the agreement when it emerged from bankruptcy.
 OPIK's Chief Operating Officer, Melody Fletcher, testified that OPIK had sufficient support from working interest partners to drill the vertical well, including Midstates. However, a number of working interest owners, including Midstates, filed a separate action in Woods County seeking a declaratory judgment to determine certain rights of non-consent working interest owners on Murrow #2, and seeking an injunction pending determination. The parties, including Midstates, dismissed that action December 2014.
 Buckles testified at trial that revenues received from the vertical well were "disappointing." It contended at trial that it accepted revenues conditionally, and that it complained to OPIK's COO about the revenues, though the trial court appears to have concluded from conflicting testimony that it never complained about the vertical well as a means to develop the Lease until suit was filed.
 Buckles' briefing addresses only that drilling a horizontal well was economical in 2014. Buckles presented no evidence at trial that suggested a horizontal well was economical after the collapse of oil prices. The trial court determined that Defendants' obligations under the implied covenant were suspended at the time litigation was filed in 2016.
 Amplify holds a 2% working interest in the Unit.
 Buckles' expert estimated the cost of a horizontal well to be approximately $3.4 million.
 Buckles does not appeal the trial court's denial of money damages or an order compelling the parties to drill a horizontal well, but limits its request on appeal to a determination that the lease should be cancelled, or alternatively, that the Court reverse an interlocutory order denying approval of a partial settlement between Buckles and Pate Group.
 Buckles notes that "neither the Oklahoma Supreme Court nor the Oklahoma Court of Civil Appeals have ever found that an 'operatorship dispute' is a factor to be considered when determining whether the implied covenant to further develop has been breached," and also notes that it could find no case in any other jurisdiction where an operatorship dispute excused a lessee's duty to further develop. Buckles has also presented no authority where this issue was addressed, or in which an Oklahoma court, or any other, has rejected an operator dispute as relevant to whether the covenant has been breached and whether equity demands cancellation of a lease.
 Buckles did not supply the trial court, or this Court, with the referenced paper upon which this proposition of error is primarily based. The Court has located the document, but finds it does not support Buckles' proposition.
 Pierce, at 7-4 (citing 5 Patrick H. Martin & Bruce M. Kramer, Williams & Meyers Oil and Gas Law 39-40 (2011)).
 The Court recognizes that Buckles also argues the operatorship dispute was created by Defendants, which is addressed separately below.
 Buckles appears to read language in Mitchell and Jackson referring to specific factors to be considered when applying the prudent operator standard as an exclusive list that restricts consideration of any other relevant circumstance, including the operator dispute. Those cases direct the court to consider "all factors, including" those relied upon by Buckles, but contain no statement that the factors identified are those which may be exclusively considered.
 Defendants argue primarily that the evidence demonstrates they acted as a prudent operator, and also that Buckles had "unclean hands" because it did not object to the drilling of a vertical well and accepted royalties therefrom, which the trial court did not adopt. (The court found that Buckles was not obligated to reject revenues from the well, even if it believed it should have been horizontal to better develop reserves.) Defendants' failure to address this argument does not amount to an admission that Buckles is correct, or even so, compel us to reverse. Buckles bears the burden of establishing the trial court erred.
 As a somewhat analogous comparison, under Oklahoma tort law, an objective standard of due care requires the fact finder to consider "whether under similar or like circumstances an ordinary prudent person" would have acted to prevent injury. See generally Pickens v. Tulsa Metropolitan Ministry¸, ¶ 10, . Whereas, "[t]he subjective standard is concerned with what the particular plaintiff in fact sees, knows, understands and appreciates. . . ." Thomas v. Holliday by and through Holliday, , ¶ 9, n.19, . The subjective standard limits a fact-finder's weighing of an actor's conduct to that which is known or believed by the individual party. In contrast, the objective standard is not a means of limiting the factual circumstances to be considered, as Buckles suggests; it is simply a requirement that the fact-finder consider how an objectively reasonably person would respond to those same circumstances, without limitation to the actual thoughts or beliefs of the individual party.
 While that litigation was pending, oil prices fell, dampening interest in drilling a horizontal well. Additionally, Midstates filed for bankruptcy in 2016, temporarily hindering further litigation.
 Pate testified, in its experience, the process was governed by majority rule. The parties did not address whether this assumption was unreasonable for one in Pate's position, or under ordinary practice.
 While the Joint Motion was not technically a motion to enforce, OPIK's objections raised the issue of whether the claims settled would be considered individual claims against Pate and could be settled, or group claims against all Defendants, that could not be settled without consent of all parties to the JOA, by its terms. The central issue, therefore, was whether the settlement agreement was validly formed and could be enforced.