B&B BUCKLES PROPERTIES v. OIL PRODUCERS INC. OF KANSAS
2022 OK CIV APP 34
Case Number: 119137
Decided: 10/19/2021
Mandate Issued: 10/12/2022
DIVISION IV
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION IV
Cite as: 2022 OK CIV APP 34, __ P.3d __

 

B&B BUCKLES PROPERTIES, LLC, Plaintiff/Appellant,
v.
OIL PRODUCERS INC. OF KANSAS; BLUESTEM OIL & GAS, LLC; JON CHRISTENSEN; SUE ANN CONERLY; D. MARIE RESOURCES, INC.; DAVLYN CORPORATION; DELTA GOLD, INC.; DURNATH CORPORATION; MELODY C. FLETCHER; GEOSTONE RESOURCES, INC.; J. DURWOOD PATE TRUST; L&J OIL PROPERTIES, INC.; LEEMAN ENERGY CORPORATION; LEON O. BUTNER TRUST; DAVID AND JANENE MALLEY; MOHICAN PETROLEUM, INC.; JAMES D. PATE, JR.; STOABS OIL CORP.; CHERI SWARTZENDRUBER; JAMES W. SWARTZENDRUBER; JAMES W. SWARTZENDRUBER, PERSONAL REPRESENTATIVE OF THE ESTATE OF TRACY R. SWARTZENDRUBER, DECEASED; KRIS S. SWARTZENDRUBER; JOHN C. SWARTZENDRUBER; TIP TOP OIL & GAS US, LLC; VIRGIL JURGENSMEYER TRUST; CHESAPEAKE EXPLORATION, LLC; AMPLIFY OKLAHOMA OPERATING LLC F/K/A MIDSTATES PETROLEUM COMPANY, LLC, Defendants/Appellees.

APPEAL FROM THE DISTRICT COURT OF
WOODS COUNTY, OKLAHOMA

HONORABLE MICKEY J. HADWIGER, TRIAL JUDGE

AFFIRMED IN PART, DISMISSED IN PART

Cody J. McPherson, MAHAFFEY & GORE, P.C., Oklahoma City, Oklahoma, and
Jana L. Knott, BASS LAW, Oklahoma City, Oklahoma, for Plaintiff/Appellant

William A. Johnson, Elizabeth A. Price, HARTZOG CONGER CASON, LLP, Oklahoma City, Oklahoma, for Defendants/Appellees

STACIE L. HIXON, PRESIDING JUDGE:

¶1 Plaintiff B&B Buckles Properties, LLC (Buckles) appeals judgment following non-jury trial entered in favor of operator, Oil Producers, Inc. of Kansas (OPIK), and a group of lessees or working interest owners holding an interest in an oil and gas lease (collectively, Defendants). Below, Buckles contended that Defendants breached the implied covenant to further develop the Lease, to which Buckles was a successor in interest, by failing to drill a horizontal well and sought cancellation of the Lease. OPIK attempted to comply with Buckles' demand. An operator dispute arose between OPIK and Defendant Midstates Petroleum Company which prevented a horizontal well from being drilled.

¶2 The trial court found that Buckles did not establish that Defendants failed to act as a reasonably prudent operator, with the exception of Midstates, that Defendants were not liable for the breach, and that Buckles was not entitled to cancellation of the Lease, an order requiring a horizontal well be drilled, or money damages. Buckles appeals the trial court's refusal to cancel the Lease. Alternatively, Buckles appeals an interlocutory minute order denying approval of a partial settlement between Buckles and a portion of the Defendants. Based on our review of the facts and applicable law, we affirm the trial court's judgment of September 18, 2020. We dismiss Buckles' appeal of denial of the motion to approve settlement for lack of an appealable order.

BACKGROUND

¶3 Buckles acquired mineral interests located in Section 4-25N-13 in Woods County in 2011, and is successor in interest to rights of lessors in an oil and gas lease dated February 16, 1981 known as the Murrow Lease (Lease). Section 4 was designated by the OCC as a 640-acre drilling and spacing unit. OPIK is the successor operator of the Unit under a Joint Operating Agreement dated August 24, 1983.

¶4 At the time Buckles acquired its interest in Section 4, OPIK operated a vertical well in Section 4, the Murrow #1, which produced in paying quantities. In 2013, Buckles expressed a desire to OPIK that it drill a horizontal well or wells in Section 4.

¶5 In late 2013, OPIK alerted its working interest partners that a royalty interest owner (Buckles) insisted on horizontal development and that they would receive a proposal in the first quarter of 2014.

¶6 OPIK negotiated a potential farm-in agreement with CMX, Inc. to drill a horizontal well. That proposal, dated February 10, 2014, provided, among other things, that CMX would drill a well in the Mississippian formation and an Arbuckle disposal well no later than June 15, 2014. CMX would receive 85% of the gross working interest, from which 10% would be assigned to Creek Real Estate Investment ("Creek") (affiliated with OPIK). CMX would carry the capital costs of the first well for all working interest owners. CMX would carry the second well for Creek, but all other working interest owners would be treated on a heads up basis for subsequent wells (i.e., working interest owners would participate in costs according to their proportionate interests). OPIK negotiated the additional 10% as consideration for assigning its interest as operator to CMX.

¶7 Buckles initially approved of CMX's proposal.

¶8 Mr. Pate contacted other entities to drill a horizontal well in Section 4, but contended none were interested, other than CMX and Midstates, because of the cost of the infrastructure.

¶9 Midstates submitted proposals to OPIK and the other working interest owners in March 2014. Contrary to Mr. Pate's understanding, OPIK did not receive the same proposal as the other working interest owners. Midstates' proposal required OPIK to give up its rights in all formations, including the Mississippian, made no provision for salt water disposal, and, in OPIK's view, essentially asked OPIK to walk away from Section 4.

¶10 Drilling a horizontal well within the Unit required a location exception from the OCC. After submitting its proposal and without consent or knowledge of OPIK, Midstates filed a cause with the OCC for a location exception on March 28, 2014, alleging that Midstates held the right to drill in the Unit. At that time, Midstates was not a lessee and held no ownership interest in Section 4.

¶11 After filing at the OCC, Midstates issued ballots to working interest owners to remove OPIK as the operator. Pate voted to remove OPIK. On May 29, 2014, Midstates represented to OPIK via correspondence that it owned over 50% of the working interest in Section 4, and that it had received votes of 74.36% of the working interest owners to remove OPIK as the operator, pursuant to the authority of the Joint Operating Agreement (JOA), and demanded OPIK step aside. However, the JOA did not provide for OPIK's removal of the operator by ballot.

¶12 During the operator dispute, CMX's proposal expired and CMX did not wish to pursue development of the Unit during the dispute. OPIK'S representative testified that OPIK attempted to find another entity willing to drill a horizontal well in Section 4, but none were interested because of the pending litigation, and later, economic circumstances. She also testified that OPIK repeatedly tried to settle the operator dispute with Midstates and reached an agreement early 2016 that Midstates then declined to sign.

¶13 In addition to the operator dispute, oil prices dropped in 2014. Defendants' expert testified that, while the price of gas was high in spring 2014, it collapsed over the next few months, impacting the viability of the well and drilling activity. He contended that the economic viability of the well was significantly less six months after Buckles' January demand letter. Pate testified that by October 2014, a horizontal well would not have been commercially viable. OPIK's COO testified that, by the end of 2014, a significant economic downturn meant that the economics for horizontal drilling were not there. The only entity interested in drilling the Unit after the collapse of oil prices was Midstates. However, Midstates withdrew its agreement with Pate and other working interest owners in August 2015, noting that OPIK had decided not to press its claims in the operator dispute for the time being due to low commodity prices. At trial, the parties (apart from Buckles)

¶14 Buckles filed the underlying action in August 2016 against OPIK and the working interest owners, asserting claims for breach of the covenant of further development, breach of the covenant to protect from offset drainage, underpayment of royalties and violation of the Production Revenue Standards Act, sought to quiet title in the mineral interests, actual and punitive damages, and to cancel the Lease. Buckles dismissed all non-quiet title/lease cancellation claims against Midstates in February 2015. Following bankruptcy, Midstates was succeeded by Amplify Operating, LLC, and is no longer involved in the Unit.

¶15 Following two day bench trial, the trial court issued detailed Findings of Fact and Conclusions of Law on September 4, 2020, which it incorporated into its judgment. Among other things, the trial court determined that, but for the operatorship dispute, a prudent operator would have drilled a horizontal well in early 2014. However, the trial court determined that a prudent operator would not commence a multimillion dollar horizontal well

. . . did not establish that OPIK and the working interest owners, with the exception of MidStates, failed to act as a reasonably prudent operator in its operation of the Morrow [sic] Unit. Accordingly, Defendants are not liable for breach of the implied covenant of further development, and Plaintiff is not entitled to the equitable relief of lease cancellation, nor an order of the Court requiring the Defendants to drill one or more horizontal wells, nor money damages.

¶16 Buckles appeals.

STANDARD OF REVIEW

¶17 Buckles' demand to cancel the Lease is a matter of equitable cognizance requiring two standards of review. Hall v. Galmor, 2018 OK 59427 P.3d 1052Id. at ¶ 12. "[I]n an equitable proceeding, where the evidence is in conflict, the findings of the trial court will not be set aside unless, after a consideration of the entire record, it appears that such findings are clearly against the weight of the evidence." Id. (citation omitted). "It is for the trial court in a case of equitable cognizance to determine the credibility of the witnesses and the weight and value to be given to the testimony." Id. However, we review issues of law de novo according to the Court's "plenary, independent and non-deferential authority to reexamine a trial court's legal rulings." Id. at ¶ 13.

ANALYSIS

A. Application of the Prudent Operator Standard

¶18 Buckles contends the trial court erred by holding Defendants were not in breach of the implied covenant to further develop because it found a prudent operator would have drilled a horizontal well in Section 4, but for the operator dispute. Buckles reasons that the operator dispute could not be considered under the objective standard of a reasonably prudent operator and that the trial court should have held Defendants breached the covenant.

¶19 Oklahoma law recognizes an implied covenant to fully develop within an oil and gas lease. See e.g. Doss Oil Royalty Co. v. Texas Co., 1943 OK 154137 P.2d 934Id. at ¶ 0 (syllabus 2). The lessor bears the burden of demonstrating a breach. Texas Consol. Oils v. Vann, 1953 OK 90258 P.2d 679Mitchell v. Amerada Hess Corp., 1981 OK 149638 P.2d 441Id.

¶20 Whether the implied covenant has been breached is determined according to the "prudent operator standard." The question is, "would a prudent operator, having due consideration for the interest of both the lessee and the lessor, considering all factors, including what is known about the market, the geology and adjoining activity, drill the proposed well." Mitchell, 1981 OK 149Union Oil Co. of Cal. v. Jackson, 1971 OK 128489 P.2d 1073Mitchell, 1981 OK 149

¶21 Though Buckles devotes significant attention to arguing that a horizontal well would have been profitable at the time of its demand, that issue does not appear to be genuinely in dispute. That issue is also not the dispositive consideration on appeal. Rather, Buckles' proposition concerns the scope of facts the trial court could properly consider when applying the prudent operator standard.

¶22 Buckles contends that the operator dispute is a subjective or "peculiar" concern of OPIK that may not be considered in assessing, objectively, whether a prudent operator would have drilled a horizontal well. The only considerations Buckles acknowledges are relevant to the prudent operator standard are whether it was possible to drill a well, and whether the well would be profitable, i.e., the economics, geology, adjoining activity and knowledge and skill available to drill. Any fact outside of these, including the operator dispute, must apparently be disregarded, in Buckles' view.

¶23 Buckles cites no authority from an Oklahoma court, or any other, supporting its position, or restricting a court from considering an operator dispute in applying the prudent operator standard.Horizontal Oil & Gas Development, Paper No. 7, Page No. 7-4 (Rock ML Min. L. FDN. 2012).Id.

¶24 According to the author, whether a well should have been drilled must be assessed not by whether it was proper for "this defendant to do, given his peculiar circumstances, but what a hypothetical operator acting reasonably would have done, given circumstances generally obtained in the locality," without regard to whether a particular defendant is short on cash, over-committed elsewhere, or prefers to spend its money on other things.

¶25 Buckles does not harmonize this extrapolation with Oklahoma jurisprudence requiring the prudent operator to "do whatever in the circumstances would be reasonably expected of operators of ordinary prudence . . . ." Vann, 1953 OK 90for the interest of both the lessee and the lessor, considering all factors," if it may consider nothing but the bare viability of a well, without regard to all surrounding circumstances. Id. (emphasis added).

¶26 Buckles' interpretation and application of an "objective" standard to omit consideration of an operator dispute or other legal impediment to developing the Lease in question is an incorrect application of "subjective" and "objective" concepts and the prudent operator standard set forth under Oklahoma law. The question here is what facts were relevant to a trial court's evaluation of whether or how the prudent operator would develop the lease.Vann, 1953 OK 90both a lessee and lessor.

¶27 Here, the record reflects that the operator dispute hindered drilling a horizontal well on the Lease. This operator dispute is relevant to assessing Defendant's conduct, in comparison to that of a prudent operator acting under similar circumstances. For these reasons, the Court finds the trial court did not err by considering the operator dispute in determining whether Defendants failed to act as prudent operators.

B. The Weight of the Evidence at Trial 

¶28 Buckles also proposes that, even if the operatorship dispute is properly considered, the trial court's determination that Defendants did not breach the implied covenant of further development is against the clear weight of the evidence. One, Buckles contends that OPIK was in breach of the implied covenant well before its demand in 2014. Two, Buckles contends that OPIK's failure to reach an agreement to drill prior to the operator dispute and the dispute itself were attributable to OPIK and other Defendants, and require a finding Defendants were in breach. The Court disagrees with Buckles' interpretation of the record and applicable law. Further, even if Defendants breached the covenant, Buckles has not established, or even addressed, whether the trial court's denial of the equitable relief of cancelling the Lease was clearly against the weight of evidence.

¶29 First, Buckles' reliance on evidence it contends demonstrates Defendants were in breach of the implied covenant years before its 2014 demand is unavailing. "[A]n action to cancel an oil and gas lease is but an action in equity to cancel a contract." Mitchell, 1981 OK 149Id. Not only must the lessor make a demand but he must provide reasonable time for compliance thereafter. See James Energy Co. v. HCG Energy Corp., 1992 OK 117847 P.2d 333

¶30 The trial court applied the foregoing authority, and considered Defendants' alleged breach from the date of Buckles' demand in January 2014. We reject Buckles' proposition that failure to drill a horizontal well prior to its demand was evidence requiring the trial court to find Defendants breached the implied covenant, or that it required cancelling the Lease.

¶31 Next, Buckles argues that the record shows OPIK and Pate failed to act prudently in the months between its demand and the operator dispute. As summarized above, OPIK began seeking proposals to drill a horizontal well before Buckles' written demand to further develop, and procured a proposal from CMX to drill a horizontal well shortly thereafter. CMX and Midstates were the only entities who ever expressed an interest in drilling in Section 4, and Midstates did not return OPIK's calls during this period. In the CMX proposal, OPIK negotiated a 10% commission for Creek, to be taken from CMX's interest, in exchange for giving up its role as operator. The trial court found there was nothing unlawful or wrongful about that proposal, though it found Pate was within its rights to seek a better deal. The conclusion that OPIK acted prudently during this period is not clearly against the weight of the evidence.

¶32 Meanwhile, Midstates was the only other entity to propose drilling a horizontal well in Section 4. The record supports the trial court's conclusion that it was not unreasonable for one in Pate's position to seek a better deal, given the commission and the cost of infrastructure necessary for CMX to drill in Section 4. Further, while Midstates' proposal was acceptable to Pate and the working interest owners, the record also supports that Midstates' different proposal to OPIK was unfavorable, or "unconscionable," and that OPIK was not obligated to accept it. The record also supports the trial court's conclusion that Pate had no knowledge that Midstates' offer to OPIK differed, and concluding that Pate, or one in Pate's position, would reasonably believe Midstates' proposal should be supported. At the very least, the conclusion that neither breached the implied covenant during this period is not clearly against the weight of evidence.

¶33 Buckles also contends that Midstates, OPIK and Pate together created the operator dispute, and that Pate and OPIK therefore did not act as a reasonably prudent operator. Again, the trial court's conclusion to the contrary is not against the weight of the evidence. Before holding any interest in the Lease, Midstates filed a competing cause for location exception at the OCC, preventing OPIK from obtaining authorization to drill a horizontal well. Midstates then attempted to remove OPIK (through a balloting process not expressly authorized by the JOA), on the apparent basis that OPIK failed to accept Midstates' unfavorable proposal. OPIK filed litigation to resolve the operator dispute.

¶34 With respect to Pate, the trial court determined that Pate was within its rights to seek a better deal, had negotiated that all parties receive the same proposal from Midstates and was thus unaware of Midstates' "unconscionable" proposal to OPIK. One might argue that Pate acquiesced to Midstates' attempt to remove the operator through a method not authorized by the JOA.

¶35 As to Midstates, it did not acquire an interest in Section 4 until it filed competing litigation to resolve the operator dispute in August 2014, after its proposal, attempt to remove OPIK as operator and filing for location exception at the OCC. While the trial court states that Midstates failed to act as a prudent operator, its breach of the implied covenant would have occurred in the relatively brief period between August 2014 and when oil practices crashed in the later part of the year. By the time of trial, Midstates had filed bankruptcy, had merged with another company, and was no longer participating in the Unit. Buckles had dismissed all claims for damages against Midstates, but for its claim to cancel the Lease and quiet title.

¶36 Equity will declare a forfeiture following breach of an implied covenant "when such forfeiture will effectuate justice," but that relief depends on the circumstances. Ramsey Petroleum Corp. v. Davis, 1938 OK 65985 P.2d 427

¶37 Buckles also argues that the workings interest owners' obligations under the Lease were indivisible, and that any finding that Midstates did not act as a prudent operator requires a determination that all Defendants breached the implied covenant, compelling the Lease to be cancelled. In support, Buckles cites authority which provides that the assignment of a lease, in whole or in part, does "not relieve the assignee from developing the property according to the express and implied covenants of the lease." Dixon v. Anadarko Prod. Co., 1972 OK 165505 P.2d 1394Amerada Petroleum Corp. v. Sledge, 1931 OK 5143 P.2d 167

¶38 Because the obligation under the Lease is indivisible, Buckles reasons that a breach by Midstates must be imputed to other Defendants. However, Buckles' argument ignores a key component to the consideration of whether a lease should be cancelled, regardless of whether one or even all of Defendants are in breach. Cancellation of a lease is an action in equity. Though Buckles treats a breach by any one Defendant as an entitlement to cancellation as a matter of law, the trial court may only cancel a lease to effectuate justice. Whether only Midstates or all Defendants failed to act as a prudent operator, nothing required the trial court to cancel the Lease in equity. Entitlement to that relief depends on the circumstances of the case.

¶39 Under the facts of record, the Court declines to hold that the trial court's refusal to cancel the Lease was inequitable, or against the weight of evidence. As the Doss court recognized, "courts and text writers condemn . . . attempts of lessees to so indefinitely free the undeveloped portions of oil and gas leases, hold them for speculative purposes, and thus prevent the owners from getting full development of their land." 1943 OK 155. Cancellation is appropriate in light of these concerns, when equity demands. However, in this case, Defendants did not sit on the Lease after Buckles' demand to further develop, despite the problems created by the competing proposals and Midstates' actions. OPIK made efforts to resolve the dispute with Midstates over operatorship, and attempted to find other entities to drill a horizontal well, though unsuccessful. In the interim, OPIK, with sufficient support from working interest owners, drilled the Murrow #2 vertical well to further develop the Lease. Buckles' arguments fail to take into account the unique and detailed fact pattern of this case, and the required application of equitable principles to its demand for cancellation. We find no error and affirm the trial court's judgment.

C. The Motion to Approve Settlement Agreement 

¶40 Buckles requests that, if the Court does not reverse the trial court's judgment, that it alternatively hold the trial court erred by failing to enforce a partial settlement agreement between Buckles and Pate reached before trial. This argument has not been reduced to an appealable order, or otherwise preserved for appeal.

¶41 On October 5, 2018, Buckles and Pate filed a Joint Motion for Entry of Order Approving Settlement Agreement, which purportedly reached a partial settlement agreement between the two parties. OPIK objected that unanimous consent of all working interest owners party to the JOA was required to approve the settlement of a joint liability. Buckles did not include an order denying the motion in the record and points us to no appealable order in its briefing. The trial court's docket reflects only a minute order denying the motion on January 31, 2019. Buckles thus appeals from a non-reviewable interlocutory minute order. "It does not fit into any category of interlocutory orders appealable by right. Nor may it be deemed final because it 'precluded plaintiff from proceeding further' or 'prevented a judgment.'" Lawson v. Boston Chrysler, Plymouth and Dodge, Inc., 1981 OK 26625 P.2d 1258

¶42 Further, motions to enforce settlement are generally treated as motions for summary judgment.Russell v. Bd. County Comm's., 2000 OK CIV APP 211 P.3d 442Myers v. Missouri Pacific R. Co., 2002 OK 6052 P.3d 1014

¶43 Though we cannot ascertain the basis of the trial court's denial of the motion to approve in this case, trial on the merits was available to resolve any disputes of fact necessary to rule upon the motion. Additionally, procedural mechanisms were available through trial to allow Buckles and Pate to press their entitlement to judgment as a matter of law. They did not do so. Enforcement or approval of the settlement agreement was not raised as an issue for trial in the pretrial order. Settlement was not offered as grounds for demurrer or directed verdict on any claim, and is not found within the parties' proposed findings of fact and conclusions of law, or in the judgment entered by the trial court. As a result, Buckles has failed to obtain an appealable ruling, and its appeal on this point is hereby dismissed.

CONCLUSION

¶44 For the foregoing reasons, we affirm the trial court's Judgment in favor of Defendants, dated September 18, 2020. We dismiss Buckles' appeal of the denial of its joint motion to enforce a partial settlement agreement between it and Pate.

¶45 AFFIRMED IN PART, DISMISSED IN PART.

FISCHER, V.C.J., concurs, and RAPP, J., concurs in result.

 

FOOTNOTES

James W. Swartzendruber, D. Marie Resources, Inc., David Malley, Janene Malley, Stoabs Oil Corporation, L&J Oil Properties, Inc., and Leeman Energy Corporation.

Id. The record reflects that disposal of salt water is a valuable feature to an agreement.

rejected an operator dispute as relevant to whether the covenant has been breached and whether equity demands cancellation of a lease.

Mitchell and Jackson referring to specific factors to be considered when applying the prudent operator standard as an exclusive list that restricts consideration of any other relevant circumstance, including the operator dispute. Those cases direct the court to consider "all factors, including" those relied upon by Buckles, but contain no statement that the factors identified are those which may be exclusively considered.

See generally Pickens v. Tulsa Metropolitan Ministry¸1997 OK 152951 P.2d 1079Thomas v. Holliday by and through Holliday, 1988 OK 116764 P.2d 165 standard is not a means of limiting the factual circumstances to be considered, as Buckles suggests; it is simply a requirement that the fact-finder consider how an objectively reasonably person would respond to those same circumstances, without limitation to the actual thoughts or beliefs of the individual party.